THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL SMITH, Defendant-Appellant.

First District (6th Division)    No. 1—94—2088

Opinion filed February 16, 1996.

Donald Hubert & Associates, of Chicago (Donald Hubert and Deborah Goldman, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and James Beligratis, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE ZWICK delivered the opinion of the court:

Following a bench trial, defendant was convicted of attempted first degree murder, conspiracy to commit first degree murder, solicitation of murder, aggravated battery with a firearm, and aggravated kidnaping arising from the shooting of Stephanie Powe on February 19, 1992. Defendant was sentenced as an habitual offender to a mandatory term of life imprisonment. On appeal, defendant claims that (1) the trial court abused its discretion in permitting the prose-

cution to reopen its case to present additional evidence, (2) the trial court erred in admitting evidence that his codefendant was murdered prior to trial and in admitting a photograph of the codefendant's bloody body, and (3) he was not proven guilty beyond a reasonable doubt.

The evidence established that on February 19, 1992, the victim, Stephanie Powe, suffered two gunshot wounds in the head and one in the right arm. After the shooting, Powe was discovered locked in her car, which was running and parked near railroad tracks in the vicinity of 110th Street and Princeton Avenue in Chicago, Illinois. Although Powe was seated in the driver's seat, she had slumped over onto the passenger side of the car and was fading in and out of consciousness. Before being taken to the hospital, Powe described the circumstances of the shooting to Chicago police officer Terrance Gibbons. Gibbons, who had entered the car through the partially open sun roof, observed fresh blood on the seats and shell casings on the back seat.

At trial, Powe described in detail her prior relationship with the defendant and the events that preceded the shooting.

Powe testified that she met defendant in late 1989 and began living with him, first in Chicago and subsequently in Will County. Powe learned that defendant was a high-ranking member of the Gangster Disciples street gang who was involved in selling cocaine. She observed him bring large amounts of cocaine to their Chicago and Will County residences.

In May 1990, defendant and Powe were arrested in Will County and charged with possession with intent to deliver a quarter of a kilogram of cocaine. In December 1990, defendant was incarcerated in the Stateville Correctional Center. At the time of trial in the instant case, the Will County drug charges were still pending against both Powe and defendant.

Powe testified that she visited the defendant every week in the penitentiary. While they were not married in the traditional sense, Powe and defendant had exchanged wedding bands. During defendant's incarceration, Powe would contact defendant by paging him on a wristwatch pager that she had delivered to him in the penitentiary. The defendant's inmate identification number had been engraved on the back of this pager. Defendant would call her from the penitentiary collect 10 to 20 times per day, and Powe would sometimes "three way" these calls so that defendant could speak with other people. Powe periodically received money from defendant during his incarceration to pay rent and car expenses.

During a visit in December 1991, defendant threatened to hurt

her if she did not act the way he believed she should. Although he was in the penitentiary, defendant told Powe that he could do anything he wanted to do to her and her brother could not protect her. Powe testified that she never visited defendant at the penitentiary again, but did receive small amounts of money from defendant during January and February 1992, and defendant continued to call her regularly. The number of the cellular telephone used by Powe was 415-2192, which was registered to defendant's father, Eddie Wilson.

On February 19, 1992, between 5 and 5:30 p.m., Powe received a call from defendant on her cellular phone. Defendant asked Powe whether she could "make a run," which she understood to mean that defendant wanted her to pick up some money, but Powe declined. At approximately 8 p.m., she received a collect call from defendant at her home. He asked her whether she still loved him, whether she was still wearing the rings and whether she would ever take them off. Powe responded in the affirmative to the first two questions and told defendant that she would never remove the rings. Defendant also asked Powe if she needed money, and she told him that she did. Defendant then instructed her to go pick up some money from "Crip," whose real name was Darren Brown.

After this conversation, Powe drove to Brown's house at 11238 South Vernon. After Powe pulled up in front of Brown's building, she received a third call from defendant on her cellular phone. Defendant asked whether Brown had not come out of his house, and Powe stated that he had not. Powe then called Brown at 568-6002 on her cellular phone. When Brown came out of the building, he got into the front passenger seat, and another man, whom Powe had never met before, got into the back seat. Powe then received the fourth and final call on her cellular phone from defendant, who told her that he wanted to speak with Brown. Powe complied and heard Brown say, "Yeah, everything is straight. All right." Brown then handed the phone back to Powe, and defendant called her an obscene name, accused her of seeing other people and demanded to know why she had been talking to the police about the drug case that was pending in Will County. At this time, the man in the back seat placed a gun to her head, and defendant told Powe that she would be dead when their conversation ended.

Brown then snatched the phone from Powe and ordered her into the back seat. When she refused, the man in the back seat hit her with the butt of his gun, grabbed her by the hair and began beating her in the face. The two men then forced her into the back seat. The man in the back seat repeatedly asked her why she had spoken to

the police and what she had told them. Brown also told her that she should not have spoken to the police.

The men demanded her rings, and Powe surrendered them, asking to be released. Brown then drove to a dark alley where the men again questioned her. After Powe again denied their accusations, Brown turned and shot her, and the man in the back seat also put a gun to her head and shot her.

Powe then lost consciousness. She testified that she remembered regaining consciousness and finding herself alone in the car. She could not see and was unable to move her arm. Using her foot, she opened the sunroof and struggled into the front seat. Powe was unable to drive and could not unlock the door. She then called Darnell Reed at 614-1844 by pressing the redial button on her car phone and told him she had been shot. Powe told Reed where she was and asked him to call an ambulance.

Sometime thereafter, Powe saw bright lights and heard someone on the roof of the car. After the door was opened, she spoke with a person she believed to be a police officer. Powe told the officer her name and requested that he not move her until she had told him what had happened. Powe was placed in an ambulance after she had described the shooting to the police officer. Powe stated that she chose not to tell the officer that she had called Darnell Reed.

Powe remained in the hospital for more than two months. A bullet had entered her right eye and passed through her jaw. A second bullet had struck her in the jaw and remained lodged near her spine. A third bullet had entered her right arm. She lost her right eye, and her right side had been paralyzed for $2^1/2$ months. Although she regained some movement, she had no feeling in her right arm and was undergoing physical therapy.

Thomas Schonauer testified that he was the chief investigator at the Stateville Correctional Center. On March 20, 1992, he and several members of the Chicago police department and of the Cook County State's Attorney's office conducted a search of defendant's jail cell, number 330, located in unit F of the penitentiary. Investigator Schonauer testified that defendant was not physically present in the unit at the time of the search. A closed circuit television camera monitored the cell. As the officials entered the cell and began their search, Investigator Schonauer was informed by radio that an inmate had just left defendant's cell and gone into the adjacent cell, number 331. The officials then searched the inmate in cell number 331 and recovered a black wristwatch pager that had defendant's inmate number inscribed on the back. After the pager was recovered, the officials resumed their search of defendant's cell and discovered two

photo albums, a ring and a list of phone numbers. The photo albums contained various pictures of defendant and Powe. A telephone was also found in defendant's cell, although Schonauer could not recall if it had a cord attached to it. Powe identified the pager and the ring recovered from defendant's jail cell as those she had given to defendant.

Investigator Schonauer testified that at certain times during the day inmates are not confined to their cells and are free to walk from cell to cell in any of the four galleries that comprise a given unit. During these free periods, the inmates also have access to telephones. Investigator Schonauer testified that the telephone cords themselves are sometimes spliced by the inmates, so that a telephone could theoretically be stretched to and from any of the four galleries in unit F.

According to Schonauer, the inmates had access to telephones, even after the final nightly count, and there was no internal monitoring system within the penitentiary that recorded or documented inmate telephone calls. The penitentiary records revealed that Darren Brown had visited defendant on February 3, 1992, and on February 7, 1992.

Chicago police detective Gerald McGovern testified that he participated in the search of defendant's cell on March 20, 1992. As he monitored defendant's cell through a television camera, he observed an inmate leave the adjacent cell and go into defendant's cell. The detective saw the inmate lift up a mattress and remove a watch, which he then placed on his wrist, before going back into the adjacent cell. Detective McGovern relayed this information to the officers who were conducting the search.

Detective McGovern testified that pursuant to his investigation of Powe's shooting, he arrested Darren Brown at 11238 South Vernon. However, Brown was murdered in October 1992. McGovern identified a graphic photograph of Brown's body as it appeared when it was discovered after the murder. This photograph was admitted into evidence without objection.

The parties stipulated that, if called as a witness, Bobby Adams would testify that she was employed by Ameritech as a records custodian and that telephone number 568-6002 was registered to Kim Smith; 644-1844 was registered to James Short; 667-6389 was registered to Inez Brown; 312-5439 was a pager number; 415-2192 was a cellular phone; and (815)722-9218/ 9219/ 9235/ 9406/ 9462/ 9546/ 9570 and 9590 are located at Stateville Correctional Center. Ms. Adams would testify further that between 8:35 p.m. and 11:50 p.m. on February 19, 1992, five calls were placed from the peniten-

tiary to the number registered to Kim Smith at 11238 South Vernon in Chicago, Illinois. These calls were placed at 8:39 p.m., 8:49 p.m., 9:14 p.m., 9:44 p.m. and 11:48 p.m.

The parties stipulated that if called as a witness, Claude Page would testify that he was employed by Ameritech Cellular telephone company and was the custodian of records. Page would further testify that in February 1992, 415-2192 was a cellular telephone number that was registered to Eddie Wilson. Page stated that Ameritech Cellular kept no record of the origin of an incoming call to a particular cellular telephone, but a record would be kept of the fact that an incoming call had been received. Page would also state that a 911 emergency call made from a cellular telephone would appear on the customer's bill as an uncharged call.

Exhibits 42 and 43, introduced by the prosecution, consisted of telephone records that established that on February 19, 1992, three incoming calls were placed to Powe's cellular telephone. The first call was made at 5:25 p.m., the second at 8:57 p.m., and the third at 9:02 p.m. Two outgoing calls were made from Powe's cellular phone on February 19 and 20. The first call was placed at 8:59 p.m. on February 19, 1992, to 568-6002, the number registered to Kim Smith at 11238 South Vernon. This was the number that Powe stated she used to reach Darren Brown. The second call was made at 12:45 a.m. on February 20, 1992, to 644-1844, registered to James Short at 480 North McClurg Court. This was the number Powe stated she used to reach Darnell Reed after she was shot.

The trial court admitted into evidence exhibits 1 through 44, excluding exhibits 18, 24, 25 and 39.

After the prosecution rested its case, defendant moved for a finding of not guilty on all charges, asserting that the State had failed to prove that defendant had placed the last call to Powe's cellular phone at 9:02 p.m. on February 19, 1992, because the telephone records indicated that no calls were made from the penitentiary at that time. The trial court denied defendant's motion.

Trial resumed the following day, and the prosecution immediately moved to reopen its case in chief in order to call an employee of the telephone company who would testify that the company kept no records of collect telephone calls made from the penitentiary. Defense counsel objected, contending that defendant would be unfairly surprised by the prosecution's introduction of evidence from a witness who had not been identified on the list of witnesses. The court granted the prosecution's request to reopen its case, stating that it would accommodate the defendant by allowing him as much time as he needed to prepare for the testimony of the telephone company em-

ployee. Defendant declined the trial court's offer of a continuance and refused the opportunity to interview the witness prior to his testifying.

The State then called Truman Armstrong, an account executive with Ameritech assigned to handle inmate telephones at Stateville Correctional Center, who testified that the eight telephones located in unit F were not configured to dial out directly, but could only be used to place collect calls. In addition, these eight telephones would not accept incoming calls. Because the charges for these calls were paid by the parties accepting the calls, the company kept no records documenting outgoing calls placed from these eight telephones. The only record of a call made from one of these inmate telephones would appear on the bill of the party accepting the call, and Armstrong did not know of any way to cross-reference calls made from the penitentiary on a particular date and time.

The prosecution then rested, and defendant renewed his motion for a directed finding, but declined the court's offer of a recess or continuance in order to further investigate the testimony of Mr. Armstrong. The court thereafter denied defendant's renewed motion for a directed finding.

Defendant called Tina Causby, who testified that she first met defendant in 1989 or 1990 and eventually developed an intimate relationship with him. Causby testified that she regularly visited defendant in the penitentiary, approximately once a month. In March 1990, Causby bought a Nissan Pathfinder, which she used along with defendant, who at that time was her boyfriend. Defendant assisted Causby in making payments on the vehicle. Causby testified that she first became aware of Stephanie Powe's existence in May 1991, when she learned that defendant and Powe had been arrested in Joliet. According to Causby, the Pathfinder was eventually stored in the garage of defendant's father, Eddie Wilson, and it remained there until June 1991. Causby ultimately discovered that Powe had possession of the vehicle. The monthly payments for the vehicle were delivered by Powe or by her mother to Wilson's home, where Causby picked them up.

Causby testified that she became concerned about her credit rating when the payments began to fall behind, and she spoke to Powe several times about the return of the vehicle. Causby eventually reported the vehicle stolen, and Powe's father, brother, and cousin were arrested as a result. Causby testified that Powe was very angry about the arrest of her family members and was very jealous of Causby's relationship with defendant.

Willie Mae Zollicoffer testified that she had known defendant for

one or two years and had known Powe since 1988. In August 1989, Zollicoffer and Powe traveled to Atlanta, Georgia, together. Powe told Zollicoffer that she had had an altercation with her boyfriend and had taken some property from his house. Powe told Zollicoffer that she wanted her boyfriend to believe that she was out of town when his home was robbed. According to Zollicoffer, Powe had a duffle bag containing drugs and jewelry with her during this trip, and she asked if Zollicoffer knew of anyone who would be interested in buying it.

Darnell Reed testified that on February 20, 1992, he had been acquainted with Stephanie Powe for one or two weeks and that they had planned to go out together on the night of the shooting. Reed stated that in February 1992, he occasionally entertained women in an apartment located on North McClurg that belonged to James Short. The telephone number for Short's apartment was 644-1844, and Reed had given this number to Powe. However, Reed denied receiving a telephone call from Powe at 12:45 a.m. on February 20, 1992. He also denied calling 911 and stated that he was not in Short's apartment at that time. Reed indicated that when Powe failed to keep their date, he never attempted to contact her again.

James Short testified that in February 1992, he lived at 480 North McClurg Court, apartment 1213, and his telephone number was 644-1844. Sometime after midnight on the morning of February 20, 1992, he received a telephone call from a woman who identified herself as "Stephanie." The caller asked whether Darnell was there. Short replied that he was not, but offered to take a message. Although the caller said that she intended to come to the Short's apartment later that night, no one ever arrived. Short testified that the caller did not say anything about having been shot, and she did not request that he call 911.

The parties stipulated that Powe did not mention Darnell Reed's name to the police or to the prosecutor until late 1993. The parties also stipulated that the narcotics charge pending against Powe and defendant in Will County was characterized as a "Super Class-X" felony, carrying a possible sentence of 9 to 40 years.

In rebuttal, the prosecution recalled Powe, who testified that she had called Darnell Reed after the shooting and asked that he call 911 on her behalf. Powe stated further that Reed called her two days after the shooting and visited her in the hospital. Powe stated that she did not mention Reed's name to the authorities earlier because she did not want to endanger him.

Following closing arguments, the trial court found defendant guilty of attempted first degree murder, conspiracy to commit first

degree murder, solicitation of murder, aggravated battery with a firearm, and aggravated kidnaping. At the sentencing hearing, the prosecution presented evidence that defendant had previously been convicted of murder on June 11, 1976, and had been convicted of possession of a controlled substance with intent to deliver, a Class X offense, on June 5, 1985. Over defendant's objection, the trial court sentenced defendant as an habitual offender to a mandatory term of life imprisonment.

We initially address defendant's argument that the trial court abused its discretion in permitting the prosecution to reopen its case to present additional evidence. Specifically, defendant argues that he was prejudiced by the admission of testimony by Truman Armstrong, the Ameritech account executive assigned to handle inmate telephones at Stateville Correctional Center. The record indicates, however, that defendant did not raise this issue in his motion for a new trial.

■ Absent plain error, the failure to object at trial or to raise an issue in a post-trial motion constitutes waiver of the issue on appeal. (*People v. Henderson* (1990), 142 Ill. 2d 258, 310, 568 N.E.2d 1234; *People v. Turner* (1989), 128 Ill. 2d 540, 555, 539 N.E.2d 1196; *People v. Enoch* (1988), 122 Ill. 2d 176, 187, 522 N.E.2d 1124.) The plain error exception will be applied only when the evidence is closely balanced or if the error is of such a magnitude that the accused is denied a fair and impartial trial. (*Henderson*, 142 Ill. 2d at 311.) Based upon the record before us, we hold that application of the plain error doctrine is not warranted here, and defendant has waived this issue by failing to include it in his motion for a new trial.

However, even if defendant had preserved this issue for review, he would not be entitled to a new trial. It is within the sound discretion of the trial court to allow a party to reopen his or her case for further proof, and this discretion will not be interfered with except where it is clearly abused. *People v. Cross* (1968), 40 Ill. 2d 85, 90, 237 N.E.2d 437; *People v. Myles* (1994), 257 Ill. App. 3d 872, 886, 629 N.E.2d 648; *People v. Millender* (1986), 140 Ill. App. 3d 504, 510, 488 N.E.2d 1105; *People v. Baer* (1974), 19 Ill. App. 3d 346, 349, 311 N.E.2d 418.

■ In the instant case, the trial court had already denied defendant's motion for a finding of not guilty prior to considering the prosecution's request to reopen its case. The testimony of Truman Armstrong, presented after the reopening of the prosecution's case, did not introduce additional proof of defendant's guilt, but merely explained the lack of a written record documenting the origin of the call received by Powe on her cellular telephone at 9:02 p.m.

Armstrong's testimony had no impact upon the previously admitted evidence that Powe had received a call at that time, nor did it tend to establish the identity of the caller. Rather, Armstrong's testimony indicated that the origin of the call could not be ascertained from the record that documented the receipt of the call by Powe on her cellular telephone. This evidence did not alter the evidence previously received that established that the telephone lines within the prison were sometimes spliced by the inmates. Defendant argued that he was not prepared to cross-examine Armstrong, who was not included on the State's list of witnesses. However, the trial court twice offered defendant a recess or a continuance and stated that it would allow defendant as much time as he required to prepare. Defendant declined the court's offers.

The prosecution's failure to include Truman Armstrong on its list of witnesses amounted to a discovery violation. Supreme Court Rule 415(g)(i) provides a variety of sanctions, including further discovery, a continuance, exclusion of the evidence, or imposition of any sanction that the court, in its discretion, deems just under the circumstances. (134 Ill. 2d R. 415(g)(i).) Upon consideration of the nature of the evidence sought to be introduced and the impact upon the defendant's case, the trial court correctly determined that permitting the defendant a recess or continuance to prepare for cross-examination of Armstrong was appropriate. However, defendant rejected the offer of a continuance and opted to proceed. Based upon this record, the trial court did not abuse its discretion in permitting the State to reopen its case to present the testimony of Truman Armstrong. See *People v. Pondexter* (1991), 214 Ill. App. 3d 79, 85, 573 N.E.2d 339.

■ We next consider defendant's assertion that the trial court erred in admitting evidence that his codefendant was murdered prior to trial and in admitting a photograph of the codefendant's bloody body. Defendant failed to object to the admission of this evidence at trial and did not include this alleged error in his motion for a new trial. Because the plain-error exception to the waiver rule is inapplicable in the instant case, defendant has waived this issue on appeal. *Turner*, 128 Ill. 2d at 555; *Enoch*, 122 Ill. 2d at 186.

Moreover, even if this issue had been preserved, it is presumed that a trial court sitting without a jury considered only competent evidence unless the contrary affirmatively appears of record. (*People v. Schmitt* (1989), 131 Ill. 2d 128, 138-39, 545 N.E.2d 665.) Defendant has not presented proof to overcome this presumption. Thus, to the extent that irrelevant or incompetent evidence was inappropriately received, we must presume that the trial judge disregarded it. Since

no prejudice to defendant has been established, the admission of the photograph of Darren Brown and of evidence of his murder would not warrant a new trial.

Finally, we review defendant's claim that he was not proven guilty beyond a reasonable doubt.

■ In reviewing a claim by the defendant that he was convicted upon insufficient evidence, the court is obligated to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Schott* (1991), 145 Ill. 2d 188, 203, 582 N.E.2d 690; *People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 453, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781.

A reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses, and a conviction will not be reversed unless the evidence is so improbable that it raises a reasonable doubt of the defendant's guilt. *People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313; *People v. Stringer* (1972), 52 Ill. 2d 564, 568, 289 N.E.2d 631.

The trier of fact is in the best position to assess the credibility of witnesses, determine the weight to be accorded their testimony, decide what inferences to draw from the evidence, and resolve any factual disputes arising from conflicting or inconsistent testimony. (*People v. Holmes* (1990), 141 Ill. 2d 204, 242, 565 N.E.2d 950; *People v. Hendricks* (1990), 137 Ill. 2d 31, 65, 560 N.E.2d 611; *People v. Reid* (1990), 136 Ill. 2d 27, 61, 554 N.E.2d 174.) Minor inconsistencies in testimony do not create a reasonable doubt as to a defendant's guilt. *People v. Brisbon* (1985), 106 Ill. 2d 342, 360, 478 N.E.2d 402; *People v. Bradford* (1989), 187 Ill. App. 3d 903, 916-17, 543 N.E.2d 918.

Defendant asserts that he was not proven guilty beyond a reasonable doubt because the State failed to present sufficient evidence to prove that he was accountable for the shooting of Powe.

■ To convict a defendant under the theory of accountability, the State must prove beyond a reasonable doubt that he (1) solicited, aided, abetted, agreed or attempted to aid another person in the planning or commission of the offense; (2) did so before or during the commission of the offense; and (3) did so with the concurrent, specific intent to promote or facilitate the commission of the offense. 720 ILCS 5/5—2(c) (West 1994); *People v. Calvillo* (1988), 170 Ill. App. 3d 1070, 1076, 524 N.E.2d 1054.

The law on accountability incorporates the "common design rule," which provides that where two or more persons engage in a

common criminal design, any acts in furtherance thereof committed by one party are considered to be the acts of all parties to the common design and all are equally responsible for the consequences of such further acts. (*People v. Terry* (1984), 99 Ill. 2d 508, 514, 460 N.E.2d 746.) Active participation has never been a requirement for the imposition of criminal guilt upon the theory of accountability. *Reid*, 136 Ill. 2d at 61.

■ The prosecution's case established that when Powe last visited defendant in the penitentiary two months before the shooting, he threatened her, stating that he could do anything he wanted to do to her and that her brother could not protect her. On the night of the shooting, five calls were made from inside the penitentiary to the telephone number used by Brown. Investigator Schonauer testified that the telephone lines within the prison were sometimes spliced by the inmates, so that a telephone could be stretched to and from any of the four galleries in unit F. Powe received a call on her cellular telephone at 9:02 p.m. She testified that this call came from defendant in the penitentiary and that he asked to speak with Brown. When Brown spoke to defendant on the cellular phone, he uttered words of agreement, indicating that he and defendant had an understanding on some topic. Immediately after speaking with Brown, defendant told Powe that she would be dead as soon as the call ended. When her conversation with defendant was concluded, Powe was interrogated, beaten and shot by Brown and by the man in the back seat. These men then left Powe alone in her car to die.

Powe's description of the events that occurred on the night of the shooting was corroborated in many respects. In particular, Powe's statements regarding the calls made and received by her were corroborated by the telephone records documenting those calls. The prosecution's case established that while defendant was incarcerated in the penitentiary, he conceived, orchestrated and executed a plan to have Stephanie Powe assassinated. It is clear from the record that defendant had virtually unrestricted access to telephones while in the penitentiary and, although he could not receive calls on those telephones, the pager in his possession effectively filled that void. The mere fact that the telephone company had no record of the origin of the call received by Powe at 9:02 p.m. was insufficient to establish a reasonable doubt as to defendant's guilt.

Defendant argued that Powe's testimony contained inconsistencies that rendered it incredible and that she had a motive to lie. However, it is well settled that the testimony of a single witness, even if contradicted, may be sufficient to sustain a conviction. (*People v. Collins* (1985), 106 Ill. 2d 237, 261-62, 478 N.E.2d 267; *People v.*

*Loferski* (1992), 235 Ill. App. 3d 675, 682, 601 N.E.2d 1135.) In the case at bar, the trial court was charged with assessing the credibility of the witnesses. The court found the testimony of Powe credible and determined that defendant was guilty beyond a reasonable doubt. In light of the record before us, we find that the evidence presented was more than sufficient to convict defendant based on accountability.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

McNAMARA and EGAN, JJ., concur.