2021 IL App (1st) 160892-U

SIXTH DIVISION
December 23, 2021

No. 1-16-0892

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County |
| v. | ) | No. 14 CR 227502 |
| | ) ) | |
| JASON SMITH, | ) ) | Honorable Charles P. Burns, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE PIERCE delivered the judgment of the court.
Justices Harris and Mikva concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Defendant is guilty of second degree murder.  Trial counsel was not ineffective. Under Rule 472, we remand the cause for defendant to move for credit against his sentence.

¶ 2   Following a bench trial, defendant, Jason Smith, was convicted of second degree murder and was sentenced to a term of 12 years' imprisonment.  Defendant now appeals and argues: 1) the State failed to prove him guilty of second degree murder beyond a reasonable doubt; 2) trial counsel was ineffective; 3) he is entitled to an additional day of sentence credit; and 4) there are

errors in the court's fines, fees and costs order that need to be corrected. For the following reasons, we affirm defendant's conviction but remand the cause for defendant to move for credit against his sentence.

¶ 3                          BACKGROUND

¶ 4     Defendant was tried in a joint bench trial with his father, co-defendant Timothy Barber, for the murder of Lamont Larkins. Defendant's theory of defense was that he acted in self-defense and defense of others and that he and Barber were authorized to use lethal force because of the amount of force used by Larkins.

¶ 5     Prior to trial, the State made an oral motion *in limine* seeking to bar the introduction of evidence that the victim had previously been arrested for domestic battery, criminal damage to property, robbery and unlawful restraint. The court held that the victim's conviction for robbery was admissible pursuant to *People v. Lynch*, 102 Ill. 2d 194 (1984), but that his other arrests were inadmissible.

¶ 6     On August 29, 2013, Gregory Benson and Lamont Larkins went to the home of defendant's aunt, Dorothy Brown. Benson and Larkins played cards against defendant, and his father, co-defendant Timothy Barber in the back yard. Brown's daughter, Tara Barber, Taurean Holmes, Katrina Baker, and Baker's boyfriend, Arthur Terry were also in the yard.

¶ 7     Brown testified that she was in bed when her daughter Tara woke her and told her that people were fighting. Brown went into the backyard and saw Larkins lying on the ground. Her great-nephew, Jason Smith, was holding a shirt to Larkin's body. Larkins would not lay still so Smith eventually walked away from him. After the ambulance took Larkins away, Brown went inside and asked defendant what happened. Defendant told her that Larkins accused him of cheating during a card game and grabbed his money. Defendant told her that they started

fighting after Larkins "muffed" him, and then defendant "stuck" Larkins twice. Brown testified that "to stick" someone meant to hit him with an object in your hand, and not just with a fist.

¶ 8    Gregory Benson testified that when he and Larkins went to play cards at Brown's house Larkins was already drunk. The men played spades. Benson was Larkins's partner and defendant was Barber's partner. Benson did not drink any alcohol, but the other three men were drinking. During the game Barber flicked a box cutter repeatedly. Benson estimated the length of the box cutter at one and a half inches when closed and perhaps three inches when opened.

¶ 9    Larkins accused defendant of cheating two times during the game. Both times, defendant told Larkins he could have the pot. When defendant needed change for a $10 bill, he went into the house and came back out a few minutes later without change. Larkins took the $10 bill from defendant's hand and said, "this my money, do something 'bout it now." Larkins then punched defendant in the face. Defendant did not fight back. Larkins struck defendant again and defendant started to fight back. When Larkins continued hitting defendant even after Larkins appeared to have gotten the best of the fight, Barber jumped in, slashing Larkins with a box cutter cutting Larkins on his arm, under his eye and on his back and chest. Benson saw no other weapon. Defendant and Barber then pushed Benson and Larkins out of the backyard, toward the alley and told them they had to leave. Defendant's female relative came outside, Benson called the police and Barber left, walking down the alley. Smith was also in the alley but left as Benson was calling the police.

¶ 10    Benson did not tell the police what he saw because defendant's family was watching him. He told police that he was called to the backyard after Larkins was stabbed. Benson spoke with the police again on September 3 and relayed what really happened when Larkins was stabbed.

Benson identified defendant and Barber from two separate photo arrays and later identified Barber as the person who slashed Larkins in a lineup.

¶ 11    Arthur Terry testified that it was a friendly card game, and then he heard Larkins and defendant arguing about money.  Larkins, Benson and Smith were drinking alcohol.    Larkins grabbed cash from defendant's hand, knocked over the table, and hit defendant in the face.  Defendant told Larkins to leave, but Larkins remained.  Defendant went inside, and when he came back out a few minutes later the fight resumed.

¶ 12    At some point during the resumed fight, Larkins and defendant were on the ground fighting and Barber became involved in the fight.  Terry did not see any weapon.  Terry tried unsuccessfully to break up the fight.  After the three fought for two to three minutes, Terry saw that Larkins was bleeding from his chest.  Larkins said, "yall [sic] stabbed me."  Terry left the house.

¶ 13    On cross-examination, Terry said Larkins took the money from defendant " before he even went into the house."  But Terry agreed that he told police that "after Jason came back out of the house, [Larkins] grabbed the money from him.  On another attempt, counsel asked, "[W]hen Jason went into the house, he came out with a $10 bill, right?"  Terry answered, "I wouldn't say yes or no.  I am unsure for that one."

¶ 14    Katrina Baker testified that it was a friendly card game but at some point, Larkins and defendant began arguing about money.  Larkins put some money in his pocket.  Defendant then went into the house and when he came to the door, he began to adjust his clothes as he returned to the yard.  When she came out of the house, she saw defendant, Barber and Larkins on the ground fighting.  She did not see anyone with a weapon.  The fighting stopped at some point and Larkins stood up and said that someone had stabbed him.  Baker saw blood on Larkins but did

not see any actual wounds. She then left with Terry. She denied seeing Larkins holding a piece of glass in his hand.

¶ 15    Tara Barber testified that the card game was calm until Smith and Larkins started arguing about money. She was inside the house when she heard Larkins say, "squad up," meaning put up your fists and fight. Tara looked out the window and saw Smith and Larkins fighting. Tara woke up Brown and asked her to try to break up the fight while Tara stayed inside with her children.

¶ 16    Taurean Holmes testified Larkins became mad because he lost. Holmes went into the house after having words with Larkins. Later, he looked out the window and saw Smith and Larkins having words. Holmes went outside and saw Smith, Larkins and Barber fighting for approximately 15 seconds. All three men were swinging. After they stopped fighting, Larkins said either, "yall [sic] stabbed me," or "you cut me." Holmes saw Larkins in the alley with bloody marks on his back and one under his forearm.

¶ 17    Dr. Eric Eason, the medical examiner, testified that Larkins was five feet eleven inches tall and weighed 232 pounds. Dr. Eason found several superficial cuts on Larkins's body that were less than an inch deep, not life threatening, and there was a stab wound on the face and a long slash wound to the arm. A box cutter could have made the cuts but would not have killed Larkins. The fatal wound was cut six inches deep into Larkins's heart, and that wound killed him. The wound was remarkable for its depth and squared off shape of blade that was sharp on one side and blunt on the other side "like a steak knife." In Dr. Eason's opinion, an instrument like a kitchen knife at least four inches long inflicted the fatal wound. Larkins' cause of death was a stab wound to his torso, and the manner of death was homicide.

¶ 18    Detective Murphy testified that he interrogated defendant on January 9, 2014. Defendant's motion to suppress the statement on the grounds that he asserted his right to remain silent was denied.   In his statement, defendant denied knowing about this incident ; that he had not heard about a backyard stabbing; he denied being in the backyard at 4301 South Calumet when Larkins was killed; he denied knowing his father's last name; and stated that he had not seen his father, Barber, since 2009.  Defendant introduced two stipulations into evidence.  The parties stipulated that Benson would testify that "other people jumped into the fight the second time once they got back up and got to fight again."  The parties further stipulated that Detective Lutzow would testify that he interviewed Katrina Baker on the day of the murder, and she told him that Larkins put money in his back pockets and said, "that's my money, what you gonna do about it?" and that  she saw a piece of broken glass in Larkins' hand.  Detective Lutzow would also testify that when he interviewed Dorothy Brown that night, she did not tell him that Smith said he "stuck him twice."

¶ 19    During closing arguments, defense counsel argued that defendant was not responsible for Larkins's death because the evidence showed that Barber had a pocketknife, not a box cutter. Defense counsel also argued that there was no evidence that defendant possessed a knife of any kind and there was no accountability for Barber's actions because they did not act in concert.

¶ 20    The trial court found defendant and Barber guilty of second degree murder.  The court found that Larkins was the initial aggressor but that neither defendant nor Barber was justified in responding with lethal force.  The court stated that "There is no evidence that deadly force was needed to defend this fistfight." The court also rejected defendant's argument that lethal force was authorized because Larkins was committing a forcible felony.  The judge said:

"It is a card game. It is a dispute over winnings. *** While it may be antisocial and it may be wrong, at best, at best, it is a theft by person. It is nowhere near a robbery. There was no force used to take that. *** It is not something where a person is being knocked down on the street and your purse is being taken ***.

*** There is no forcible felony."

¶ 21　The court found defendant guilty of second degree murder and sentenced him to 12 years' imprisonment. This appeal followed.

¶ 22　　　　　　　　　　　　　　ANALYSIS

¶ 23　Defendant first argues that the State failed to prove him guilty of second degree murder beyond a reasonable doubt because the State failed to prove that he stabbed Larkins or was accountable for Barber's actions.

¶ 24　When reviewing the sufficiency of the evidence in a criminal case, we must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Smith*, 185 Ill. 2d 532, 541 (1999). We will not reverse a criminal conviction unless the evidence is so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *People v. Rowell*, 229 Ill. 2d 82, 98 (2008). A reviewing court does not retry the defendant or substitute its judgment for that of the trier of fact with regard to the credibility of witnesses or the weight to be given to each witness' testimony. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). Rather, we "carefully examine the evidence while bearing in mind that the trier of fact is in the best position to judge the credibility of witnesses, and due consideration must be given to the fact that the fact finder saw and heard the witnesses." *People v. Herman*, 407 Ill. App. 3d 688, 704 (2011).

¶ 25    Section 9-2 of the Criminal Code of 1961 (Code) provides that a person commits second degree murder when he commits first degree murder, and a mitigating factor is present. 720 ILCS 5/9-2(a)(2) (West 2008). The elements of first and second degree murder are identical but second degree murder differs from first degree murder only in the presence of a mitigating factor, such as an alleged provocation or an unreasonable belief in justification. *People v. Porter*, 168 Ill.2d 201, 213 (1995). For a defendant to be guilty of second degree murder, the State must first prove the defendant guilty of first degree murder beyond a reasonable doubt. 720 ILCS 5/9-2(c) (West 2014). The burden then shifts to the defendant to prove the existence of the mitigating factor by a preponderance of the evidence. 720 ILCS 5/9-2(c) (West 2014).

¶ 26    "[T]o raise a claim of self-defense, a defendant must present evidence supporting each of the following elements which justify the use of force in defense of a person: (1) that force had been threatened against defendant; (2) that defendant was not the aggressor; (3) that the danger of harm was imminent; (4) that the force threatened was unlawful; (5) that defendant actually believed that a danger existed, that the use of force was necessary to avert the danger, and that the kind and amount of force actually used was necessary; and (6) that defendant's beliefs were reasonable." *People v. Morgan*, 187 Ill. 2d 500, 533 (1999). Once the defendant has made a minimal showing on each of the necessary elements for self-defense, "the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense." *People v. Lee*, 213 Ill. 2d 218, 224 (2004). The determination of whether a defendant is guilty of first degree murder or guilty of second degree murder is a question for the finder of fact. *People v. Simon*, 2011 IL App (1st) 091197, ¶ 52.

¶ 27 According to defendant, the charges against him were based on a theory that either he or Barber killed Larkins-one of them was the principal and the other the accomplice. The State did not identify which defendant was the principal and which was the accomplice because both defendants were accountable for each other's actions. Defendant contends that the evidence is insufficient to establish that he was either the principal or an accomplice because there were no witnesses who saw him holding a knife at any time, no one saw him stab Larkins and there was no evidence that he shared Barber's criminal intent. We disagree and find that a reasonable trier of fact could have found, as the circuit court did in this case, that defendant acted "in concert," "shared a mental state" and "had a single purpose in mind" with his co-defendant father to prove defendant guilty of second degree murder beyond a reasonable doubt.

¶ 28 Viewing the evidence in the light most favorable to the State, the evidence established that during the course of the fight, Larkins suffered a six-inch-deep stab wound to the heart, a one-quarter inch deep facial cut, a two-inch deep wound to his back. Larkins was stabbed during the fight and later died of those wounds. Defendant and Barber were the only persons fighting Larkins that evening. Direct evidence established that Barber had a box cutter in his possession that evening, and he was seen flicking it open and closed before the fight.

¶ 29 The circuit court found it did not need to determine whether there were two knives or cutting instruments involved in this fight because defendant was also equally guilty of Larkins' death under a theory of accountability. To convict a defendant under the theory of accountability, the State must prove beyond a reasonable doubt that he (1) solicited, aided, abetted, agreed or attempted to aid another person in the planning or commission of the

offense; (2) did so before or during the commission of the offense; and (3) did so with the concurrent, specific intent to promote or facilitate the commission of the offense. 720 ILCS 5/5-2(c) (West 2004); *People v. Smith*, 278 Ill. App. 3d 343, 355 (1996). The law on accountability incorporates the "common design rule," which provides that where two or more persons engage in a common criminal design, any acts in furtherance thereof committed by one party are considered to be the acts of all parties to the common design and all are equally responsible for the consequences of such further acts. *People v. Cooper*, 194 Ill. 2d 419, 434-35 (2000).

¶ 30    Accountability may be established through a person's knowledge of and participation in the criminal scheme, even though there is no evidence that he directly participated in the criminal act itself." *In re W.C.*, 167 Ill.2d 307, 338 (1995). "Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another." *Cooper*, 194 Ill. 2d at 435. Nevertheless, "mere presence at the scene, even with knowledge that the crime is being committed, is insufficient to establish accountability for the actions of another." *W.C.*, 167 Ill. 2d at 338.

¶ 31    The evidence established that defendant and his father, codefendant Barber, fought the victim together, both throwing punches at Larkins.  Before Barber's involvement, the fight ranged from one side of the yard to the other, was broken up at least once and defendant left the back yard and went into the house, returning to the fight a short time later. When the fight resumed, Barber joined the fight. Rather than withdraw, defendant continued to fight Larkins for two or three more minutes.  During this time both defendant and Barber were hitting the victim, and as the trial judge found, "this father-son team are acting in

concert *** they shared the same mental state *** they had a single purpose in mind *** the fight started on one side of the yard and goes to the other side of the yard. The fight continued until Larkins stated that he had been stabbed. Larkins was seen bleeding from his chest and back and he was observed with cuts to his face and arm. Defendant shared a common design with Barber, he admitted stabbing the victim twice, he denied knowing anything about the incident that his friends and relatives implicated him in and he failed to report the crime and fled the scene all support this conviction. See *People v. Nelson*, 2017 IL 120198. A rational trier of fact could have found that defendant and Barber shared the same design in fighting the victim.

¶ 32    Our supreme court has specifically found that "a defendant may be found guilty under an accountability theory even though the identity of the principal is unknown." *People v. Cooper*, 194 Ill. 2d 419, 435 (2000). In *Cooper*, two defendants were found guilty under an accountability theory for aggravated battery with a firearm, even though it was unclear which of the defendants shot the victim. Our supreme court affirmed their convictions because the defendants were working in concert as part of a common design. The failure to identify the shooter did not preclude a finding of guilt under the common design theory of accountability. *Id*. at 436.

¶ 33    Similarly, in *People v. Cooks*, 253 Ill. App. 3d 184 (1993), this court affirmed a defendant's conviction for murder under an accountability theory, even though the actual shooter was never identified. In that case, the defendant and several of his fellow gang members pursued rival gang members after a fight. Eventually, the rival gang members were trapped in the vestibule of a tavern. Defendant fired into the vestibule and struck one victim in the leg. Defendant also shot another victim in the head and killed him. During the

shooting, "[a]n 'arm' holding a shotgun" fired into the vestibule and shot the first victim in the stomach, killing him. *Id.* at 189.

¶ 34    The *Cooks* court found that the evidence sufficiently established that the defendant shared a common design with the co-offender as the defendant facilitated the plan to harm rival gang members. The defendant also aided the unidentified shooter by first shooting the victim in the leg and making him more vulnerable to the subsequent shot. The court further noted that the shots were fired as part of a joint action and the defendant did not attempt to intervene or voice opposition to the actions of the co-offender. Id. at 189-90.

¶ 35    Based on evidence in this case, a rational trier of fact could have found defendant guilty of Larkins' murder under an accountability theory where he shared a common design with his father in fighting Larkins and in the course of the fight Larkins was fatally stabbed; defendant admitted that he "stuck" the victim twice, he fled the scene, he did not report the crime, and he denied knowing anything about the stabbing or being at the scene with his father (who he claimed he had not seen in over four years and did not know his last name). It was for the trial court to determine the credibility of the witnesses and the weight to be afforded their testimony. See *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). Here, the court found the evidence was sufficient to sustain defendant's conviction for second-degree murder and this finding is not so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of defendant's guilt.

¶ 36    We likewise reject defendant's argument that even if he did cause the fatal wound or was accountable for Barber's actions, he and Barber had lawful authority to use lethal force because defendant was being robbed by an aggressive, intoxicated Larkins.

¶ 37    There was no evidence that Larkins was armed during the fight with defendant. There was no need to bring a knife to this fist fight.  While it is not necessary that the aggressor be armed for a defendant to succeed on a self-defense theory, it still must "appear that the aggressor is capable of inflicting serious bodily harm without the use of a deadly weapon, and is intending to do so." *People v. Hawkins*, 296 Ill. App. 3d 830, 837 (1998). There simply was no evidence to infer that Larkins was inflicting serious bodily harm to either defendant or his father.  Although he outweighed defendant, defendant was four inches taller and younger than Larkins.  The evidence established that Larkins was drunk. There were two people fighting Larkins, and one or both of them was armed while the victim was not.

¶ 38    Defendant also argues that the use of force was justified because Larkins was in the process of committing a robbery.  To justify the use of deadly force, the defense presented evidence that Larkins committed robbery, a forcible felony (720 ILCS 5/2-8 (West 2012)). A person commits robbery "when he or she knowingly takes property from the person or presence of another by the use of force or by threatening the imminent use of force."  720 ILCS 5/18-1 (West 2014).

¶ 39    Viewing the evidence in the light most favorable to the State we must reject this argument.  There was conflicting testimony from occurrence witnesses about whether Larkins took the money from defendant before or after defendant went into the house and whether the fist fight began before or after defendant went into the house.  There was testimony that Larkins snatched the money out of defendant's hand and put it in his pocket. Whether this amounted to force was for the trier of fact to consider.  As the court found,

"It is a card game. It is a dispute over winnings. *** While it may be antisocial and it may be wrong, at best, at best, it is a theft by person. It is nowhere near a robbery. There was no force used to take that. *** It is not something where a person is being knocked down on the street and your purse is being taken ***.

*** There is no forcible felony."

The trial judge's finding was amply supported by the evidence and defendant was properly found guilty of second degree murder.

¶ 40     Defendant next claims that counsel was ineffective for: (1) failing to sever the cases when it became clear that he and Barber had antagonistic defenses; (2) failing to introduce evidence that Barber's knife was capable of causing Larkins's death; (3) failing to introduce any authority to support Dorothy's statement that "I stuck him" meant "I punched him,"; and (4) failing to introduce Larkin's prior conviction for robbery as *Lynch* evidence that had previously been deemed admissible.

¶ 41     To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's performance was deficient and (2) counsel's actions resulted in prejudice to the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Evans,* 209 Ill. 2d 194, 220 (2004). Under the first prong, a defendant must demonstrate that his attorney's performance fell below an objective standard of reasonableness. *Evans*, 209 Ill. 2d at 220. Under the second prong, prejudice is shown where there is a reasonable probability that the result would have been different but for counsel's alleged deficiency. *Id*. Failure to satisfy either prong of the Strickland test precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697.

¶ 42     The scrutiny of defense counsel's performance is highly deferential due to the inherent difficulties of making the evaluation, and the reviewing court must indulge in a strong

presumption that counsel's conduct fell within the range of reasonable professional assistance. *People v. Robinson*, 299 Ill. App. 3d 426, 433 (1998). To prevail, defendant must satisfy both prongs of the *Strickland* test, and if this court concludes that defendant did not suffer prejudice, we need not decide whether counsel's performance was deficient. *People v. Harris*, 206 Ill. 2d 293, 304 (2002).

¶ 43    Section 114-7 of the Code of Criminal Procedure (Code) allows for the joinder of related prosecutions if the offenses and defendants could have been joined in a single charge (725 ILCS 5/114-7 (West 2010)), and for severance if it appears that a defendant or the State is prejudiced by such joinder (725 ILCS 5/114-8 (West 2010)). Here, both defendant and Barber agreed to a joint bench trial without objection, yet defendant now claims that his counsel was ineffective for failing to file a motion to sever his trial from that of Barber.

¶ 44    There are two independent grounds for severance in Illinois. *People v. James*, 348 Ill. App. 3d 498, 507 (2004). The first involves an interference with defendant's right of confrontation where codefendant has made out-of-court statements which implicate defendant, and the second involves a situation where the defenses are so antagonistic that one of the codefendants cannot receive a fair trial if they are tried jointly. *Id*. Defendant's claim is based on his belief that his defense and that of Barber were highly antagonistic because both he and Barber claimed that the other defendant was responsible for striking the fatal blow. *People v. Gabriel*, 398 Ill. App. 3d 332, 347 (2010). This occurs where one defendant targets the other as the actual perpetrator of the offense or where each protests his innocence in condemning the other. *Id*.

¶ 45    The record in this case shows that Smith's defense counsel agreed to sever defendant's case from Barber's on a limited basis.  On the day of trial, the prosecutor informed the court that

defendant's attorney wanted a motion to sever. The parties discussed the issue with the court and defense counsel explained that, "the State hasn't decided what, if any, statements of the defendant's she is putting in. So other than the statements, I am asking the evidence be heard at the same time." The court indicated that because this was a bench trial, it would "only introduce competent testimony against a particular defendant." During trial, Detective Murphy testified to a custodial statement Barber made. Before admitting the video of the statement, the court stated, "[t]his is the severance. This is just going in as to Mr. Barber's case." Barber's videotaped statement was then played wherein he admitted stabbing Larkins in the back with a box cutter two or three times during the fight. Barber did not know if defendant stabbed Larkins and he did not see Larkins with a knife. Barber admitted that he was drunk at the time of the stabbing but stated that he stabbed Larkins because he "had the best" of defendant. Barber left the scene and threw the knife in the bushes.

¶ 46     Defendant contends that the lack of a full severance resulted in a trial where he was prejudiced because he and Barber claimed that the other defendant was responsible for striking the fatal blow. We disagree. Nothing in Barber's statement could be considered as evidence that defendant was the one who killed Larkins: Barber admitted being drunk when he stabbed Larkins in the back with a box cutter because Larkins was getting the better of defendant and Barber denied knowing if defendant stabbed him. As discussed *infra*, the evidence established that defendant was guilty of second degree murder as both a principal and an accomplice. The State argued that defendant acted as the principal and argued that defendant had a knife and used it to inflict the fatal blow, but at the very least he was an accomplice to the murder of Larkins. Defendant suffered no prejudice.

¶ 47     Defendant also contends that certain facts would not have been admitted had trial counsel

moved to sever the cases. We disagree. Defendant claims that Dorothy's testimony on what defendant meant when he told her that he stuck the victim twice would not have come out had counsel severed the cases. However, the State proffered this statement as evidence in opening statements and then put Dorothy on the stand and elicited the statement. Defense counsel elicited testimony from Dorothy that she though saying stuck him meant hitting with a fist and then reiterated Dorothy's testimony in closing arguing, "[s]tuck him, as she said, could also mean punch him in the face, hit him with something else; a rock, a stick, anything that was out there." Even if the trials were severed, defendant's statement, "stuck him" was of extreme evidentiary import to this case and was going to be introduced regardless. Severing the trial would not have changed the evidence. Defendant suffered no prejudice.

¶ 48    Next, defendant argues that the evidence regarding the fatal wound and which defendant caused that wound solely resulted from the failure to sever the case. Again, the record shows that this issue was inherent in the facts of the case and would have come out regardless of whether the cases were severed. The evidence showed that Larkins was attacked by defendant and Barber. The testimony further established that Barber was in possession of a box cutter. Dr. Eason testified that Larkins suffered wounds from two different instruments, a box cutter and something resembling a kitchen knife. Dr. Eason opined that the box cutter did not cause the fatal wound. The State's evidence showed, and Barber admitted, that Barber had a box cutter which could not have caused the fatal wound based on the length and shape of the blade and the fatal wound inferentially was inflicted by the other combatant. Severing the trial would not have changed this evidence and therefore defendant suffered no prejudice.

¶ 49    Defendant also argues that trial counsel was ineffective for failing to introduce evidence that Barber's weapon could have caused the fatal wound. Dr. Eason testified that based on its

shape and the length of the blade, a box cutter could not have caused the fatal blow. This is the only evidence in the record on this issue. We follow the well-established rule that this court should not address claims of ineffective assistance of counsel involving matters outside the record on direct appeal. *People v. Ligon*, 365 Ill. App. 3d 109, 122 (2006). Ineffective assistance of counsel claims are better suited to collateral proceedings when "the record is incomplete or inadequate for resolving the claim." *People v. Veach*, 2017 IL 120649.

¶ 50 Defendant contends that counsel was ineffective for failing to introduce evidence on alternative meanings of the phrase "stuck him." Defendant suffered no prejudice where multiple interpretations of the phrase were in fact argued by defense counsel and, in any event, it is for the trier of fact to decide what the term meant and what import to give it. In addition, defendant argues that counsel could have called an independent expert to explain what the term meant in the context of what was said. Again, defendant raises a matter outside of the record in this case and this claim is better suited to collateral proceedings. *Id.*

¶ 51 Defendant claims that trial counsel was ineffective for failing to introduce *Lynch* evidence of Larkins's prior robbery that was deemed admissible in a pretrial proceeding. As explained in *People v. Barber*, 2019 IL App (1st) 1160800-U, ¶ 49, *Lynch* evidence could not properly be introduced in this case where there was no question that Larkins was the aggressor. Therefore, counsel was not ineffective for failing to introduce such evidence.

¶ 52 Finally, defendant argues that he is entitled to an additional day of sentence credit, and six assessments classified as fees are actually fines and must be offset by his $5 per day presentence incarceration credit. Defendant did not raise these issues in the trial court.

¶ 53 This issue governed by Illinois Supreme Court Rule 472 (eff. Mar. 1, 2019), which was adopted after defendant filed his brief. Rule 472 sets forth the procedure in criminal cases for

correcting certain sentencing errors, including "[e]rrors in the imposition or calculation of fines, fees, and assessments or costs," "[e]rrors in the application of per diem credit against fines," "[e]rrors in the calculation of presentence custody credit," and "[c]lerical errors in the written sentencing order." Ill. S. Ct. R. 472(a) (eff. Mar. 1, 2019). The rule provides that, in criminal cases, "the circuit court retains jurisdiction to correct" the enumerated errors "at any time following judgment ***, including during the pendency of an appeal." Ill. S. Ct. R. 472(a) (eff. Mar. 1, 2019). Additionally, "[n]o appeal may be taken" on the ground of any of the sentencing errors enumerated in the rule "unless such alleged error has first been raised in the circuit court." Ill. S. Ct. R. 472(c) (eff. Mar. 1, 2019).

¶ 54    More recently, our supreme court amended Rule 472 by adding paragraph (e) (Ill. S. Ct. R. 472(e) (eff. May 17, 2019)), which provides: "In all criminal cases pending on appeal as of March 1, 2019, or appeals filed thereafter in which a party has attempted to raise sentencing errors covered by this rule for the first time on appeal, the reviewing court shall remand to the circuit court to allow the party to file a motion pursuant to this rule."

¶ 55    Defendant's appeal was pending on March 1, 2019. Thus, pursuant to the provisions of Rule 472, we remand to allow defendant the opportunity to file a motion to correct any sentencing errors.

¶ 56                              CONCLUSION

¶ 57    In light of the foregoing, we affirm defendant's conviction but remand to the trial court to allow defendant the opportunity to file a motion to correct any sentencing errors.

¶ 58    Affirmed; remanded for consideration of defendant's fines and fees claim.