THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL THOMPSON, Defendant-Appellant.

First District (4th Division)    No. 1—97—4558

Opinion filed May 18, 2000.

Scott D. Sherwin, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Kenneth T. McCurry, Jon J. Walters, and Katherine Blakey Cox, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HALL delivered the opinion of the court:

Defendant, Michael Thompson, was charged with two counts of first degree murder. Jamal Harmon, Eugene Wiseman, and Craig Newton were also charged by the same indictment with first degree murder but were not tried with defendant. Following a jury trial, defendant was found guilty of first degree murder under an accountability and transferred intent theory. Defendant filed a timely motion for a new trial on July 24, 1997, and an amended motion for a new trial on July 25, 1997. Both were denied. On September 18, 1997, defendant was sentenced to serve a 75-year prison term. Defendant filed a motion to reconsider sentence. On October 23, 1997, defendant was resentenced to 60 years. Defendant filed a timely notice of appeal on November 11, 1997.

On appeal defendant contends: (1) that the State failed to prove him guilty beyond a reasonable doubt of first degree murder; (2) that several remarks made by the prosecutor during closing arguments prevented him from receiving a fair trial; (3) that the circuit court erred in admitting improper and prejudicial evidence; and (4) that the circuit court erred by refusing to give the cautionary accomplice jury instruction. For the following reasons, we reverse and remand this cause for a new trial. The following facts are relevant to our determination in this appeal.

## BACKGROUND

On June 19, 1995, A.Z., an innocent female bystander, was shot and killed in Marquette Park during a gang fight. The incident involved two rival street gangs, the Black Disciples and the "Krazy Get Down Boys" (KGB's). In the summer of 1995, defendant was a member of the Black Disciples holding the rank of co-minister. Harmon, Wiseman and Newton were also Black Disciples. In the summer of 1995, Eddie Frazier, Jr., Derrick Johnson and April Alston were also Black Disciples.

Blanca Morales testified that on the evening of June 19, 1995, she, the victim, and a friend named Matilda drove into Marquette Park and parked next to a bridge by a pond inside the park. The three exited the car and stood looking at the water. Morales saw a group of Hispanics standing on a nearby bridge. Suddenly, numerous gunshots came from behind where the females were standing. The females ducked behind the car. After the gunshots ceased, Morales discovered the victim lying on the ground with blood coming from her arm. Morales, with the help of Matilda and the people from the bridge, put the victim in her car and drove her across a field to Holy Cross Hospital. The victim was pronounced dead at Holy Cross Hospital.

Both Frazier and Johnson testified that on June 18, 1995, they were in Marquette Park with two females when they were approached by a group of KGBs. One of the KGBs hit Frazier in the head with a gun. As Frazier and Johnson started running, the KGBs began shooting at them. Johnson testified that he told Harmon about the incident that night.

Alston admitted that, at the time of the trial, she was in custody in Cook County jail facing a charge for heinous battery. This charge was not connected to the present case. Alston testified that she expected no leniency in exchange for her cooperation with the State in this case.

On June 19, 1995, at 8 p.m., Alston was on the defendant's front porch with defendant and some other Black Disciples. Alston testified that she saw defendant, Harmon, and Newton go upstairs into the defendant's house. After a short time she saw Harmon leave the house carrying a black gym bag that he placed in the trunk of Newton's car. She could not see what was inside the black gym bag. She testified that defendant told her to get into Newton's car. She did. Defendant drove Harmon, Wiseman, and a Black Disciple named Rickey to the edge of Marquette Park in Harmon's car. Newton and Alston followed in Newton's car. Once at the park, Alston testified that she got out of Newton's car and got into Harmon's car. She saw Harmon, Wiseman, and Rickey get out of Harmon's car and open the trunk of Newton's

car. Alston and defendant then drove away from Marquette Park and returned to defendant's front porch. On the way back to defendant's house, defendant told her that there was going to be a retaliation in the park.

Alston testified that Newton, Wiseman, Rickey, and Harmon returned to defendant's house about 10 to 15 minutes later. She saw Harmon take the black gym bag out of Newton's trunk and bring it into defendant's house.

In May 1996, after being contacted by defendant and his wife, Alston gave defense counsel a court-reported recantation of her prior statements. Alston's trial testimony was consistent with both her police statement and her grand jury testimony except that in those pretrial statements she denied membership in the Black Disciples.

Frazier testified that he retired from the Black Disciples on June 20, 1995. During this trial, Frazier was in custody on an outstanding McLean County warrant from breaking a person's jaw. Frazier testified that he expected no consideration from the State on his pending case in exchange for his cooperation in this case.

Frazier testified that, on June 19, 1995, he was on defendant's porch for about six minutes before he left and went home. Frazier heard defendant talking to Wiseman about a hit in the park that night. When Frazier later returned to defendant's house, Wiseman showed Frazier a .38-caliber gun and stated that they had taken care of business for him. Frazier identified People's exhibit No. 13 as a gun he had seen in defendant's house about a year before.

In the fall of 1995, after being contacted several times by defendant and his wife, Frazier gave a court-reported recantation of his earlier statements. His trial testimony, however, was consistent with his earlier statements to police and his grand jury testimony.

Johnson testified that on June 19, 1995, at 9 p.m., he was on the defendant's front porch. He heard defendant tell Harmon and Wiseman to park at 70th and California and walk through Marquette Park because the KGBs should be there. He then told them to "spray the mother f--kers," which Johnson interpreted as a command to shoot KGBs. He saw defendant, Harmon, and Newton go upstairs in defendant's house. When they came out, about five minutes later, Harmon was carrying an Uzi machine gun pistol while defendant carried a black gym bag. He said that he and Frazier had seen the same Uzi machine gun and black gym bag one year earlier on defendant's bed. Johnson identified People's exhibit No. 13 as the gun that he saw Harmon carry out of defendant's house. After Harmon, Wiseman, Newton and Rickey returned to defendant's porch, defendant told Johnson "we got the mother f--kers. Tell Eddie that it was taken care of."

After being contacted several times by defendant and his wife, Johnson gave a court-reported recantation of his prior statements. However, his trial testimony was entirely consistent with his earlier statements to police and his grand jury testimony.

Detective Bloore testified that Newton led police to a garage at 6924 S. Laflin, where the police recovered an Uzi machine gun pistol in a white bag. Ernest Warner, an expert in firearms, testified by stipulation that the bullet was a 9 millimeter, but was unsuitable for comparison due to its damaged condition. He further testified that the bullet had the same class characteristics as the 9 millimeter Uzi recovered by the police and that the bullet could have been fired by that gun.

## DISCUSSION

### I. CLOSING ARGUMENT

Defendant argues that several errors occurred in the State's closing argument. We need only discuss one. Defendant argues that the prosecutor improperly accused defense counsel, Mr. Sherwin, of trying to "fix" this case:

> "Sexton: Is it real surprising they went to his office? And how about this, folks, you think it's a coincidence that not just one or two, all three of the witnesses who happened to be witnesses against Michael Thompson, they all go to the lawyer's office. I mean he's talking about how he's entitled to the documents, what are we talking about here? We're talking about the law firm of Sherwin and Thompson here. Thompson is the leg man. He's the one who's going to get the witnesses in, get them to change their testimony and set it up and hand it over to his lawyer. So he can fix the case then."

Comments, such as these, disparaging the integrity of defense counsel and implying that the defense presented was fabricated at the direction of counsel have consistently been condemned. *People v. Starks*, 116 Ill. App. 3d 384, 451 N.E.2d 1298 (1983); *People v. Emerson*, 97 Ill. 2d 487, 455 N.E.2d 41 (1983). Accusations of deception and trickery by defense counsel serve no purpose except to prejudice the jury. *People v. Beringer*, 156 Ill. App. 3d 309, 509 N.E.2d 578 (1987).

The State argues that these comments were proper because they referred to defendant, not to defense counsel. We disagree. The clear implication of these comments was that defendant and defense counsel were engaged in some nefarious plan to obtain witness recantations and to "fix" defendant's case. The State further argues that any error associated with these comments was harmless because the trial court sustained an objection to these comments and admonished the jury to

disregard the implication that defense counsel did anything improper. The act of promptly sustaining the objection and instructing the jury to disregard such argument is usually sufficient to cure any prejudice. *People v. Childress*, 158 Ill. 2d 275, 633 N.E.2d 635 (1994). But not always. We find that the prejudice from the comments in this case was of such a magnitude that the jury was poisoned. The court's admonishments after the fact could not erase the serious damage that was already done.

In general, a prosecutor is given great latitude during closing argument. *People v. Cisewski*, 118 Ill. 2d 163, 514 N.E.2d 970 (1987). However, prosecutors must remember that there are limits. We find that the prosecutor far exceeded those limits in this case. Improper comments during closing argument warrant reversal where the argument as a whole was so seriously prejudicial that it deprived the defendant of a fair trial. We find that the prosecutor's comments so seriously prejudiced defendant that he was denied a fair trial and is entitled to a new one.

## II. REASONABLE DOUBT

■ Our disposition makes it unnecessary for us to consider the remaining issues raised by defendant on appeal. However, we note our belief that the evidence at trial was sufficient for the trier of fact to conclude that defendant was guilty beyond a reasonable doubt.

A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of defendant's guilt. *People v. Campbell*, 146 Ill. 2d 363, 586 N.E.2d 1261 (1992); *People v. Collins*, 106 Ill. 2d 237, 478 N.E.2d 267 (1985). When a defendant challenges the sufficiency of the evidence, we must decide whether, after considering all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979); *People v Howery*, 178 Ill. 2d 1, 687 N.E.2d 836 (1997).

A person commits first degree murder if he performs the acts that cause the death of a person, and either intends to kill or do great bodily harm to that person or another, or knows that such acts will cause death to that person or another. 720 ILCS 5/9—1(a)(1) (West 1996). To convict a defendant of murder based on an accountability theory, the State must prove beyond a reasonable doubt that: (1) the defendant solicited, aided, abetted, agreed, or attempted to aid another person in the planning or commission of the murder; (2) the defendant's participation occurred either before or during the commission of the murder; and (3) the defendant had the concurrent, specific

intent to promote or facilitate the commission of the murder. 720 ILCS 5/5—2(c) (West 1996); *People v. Batchelor*, 171 Ill. 2d 367, 665 N.E.2d 777 (1996). Active participation is not a requirement for imposing criminal liability under an accountability theory since a defendant may aid and abet without actively participating in the overt act. *Batchelor*, 171 Ill. 2d at 376. The intent to promote or facilitate a crime may be shown by evidence that the defendant shared the criminal intent of the principals or by evidence that there was a common criminal plan or design. *Batchelor*, 171 Ill. 2d at 376.

The law of accountability incorporates the "common design rule," which provides that, where two or more persons engage in a common criminal design, any acts in furtherance thereof committed by one party are considered to be the acts of all parties to the common design and all are equally responsible for the consequences of such further acts. *People v. Smith*, 278 Ill. App. 3d 343, 662 N.E.2d 480 (1996). When a defendant is convicted on an accountability theory, he shares equal guilt with the principal perpetrators of the crime. *People v. Brown*, 267 Ill. App. 3d 482, 641 N.E.2d 948 (1994).

Under the doctrine of transferred intent, if a defendant shoots at one person, with the intent to kill, but kills an unintended victim, he may be convicted of the crime of murder for the death of the unintended victim.

Defendant argues that he could not be proved guilty beyond a reasonable doubt of first degree murder on an accountability and transferred intent theory because the State failed to identify the shooter or the target. Defendant points out that there was no testimony as to who actually shot the victim. No witness testified that he saw any Black Disciples in Marquette Park on the night in question. Defendant argues that no rational inference can be drawn from the evidence that either Harmon, Wiseman, Newton or Rickey was the shooter. We disagree.

Defendant relies on *Fagan v. Washington*, 942 F.2d 1155 (7th Cir. 1991), where the seventh circuit found that the State did not prove the accomplice defendant guilty of murder under an accountability theory because the prosecution did not prove the identity of the principal shooter beyond a reasonable doubt. In that case, the defendant and several fellow Black Gangster Disciple (BGD) gang members went to a game room that was known to be a Vice Lords hangout. The BGDs were seeking revenge against the rival Vice Lord gang members. Defendant and Dede, another BGD, fired several shots into a group standing out in front of the game room. Defendant and Dede were about 45 feet away from the group when they fired. The evidence established that neither defendant nor Dede fired the fatal bullet.

Thus, defendant was found not guilty based on an accountability theory.

The seventh circuit recognized that it did not matter whether Fagan or some other member of his gang fired the fatal bullet.

> "The group had vowed revenge. Their scheme encompassed the murder of anyone whom they believed to be a Vice Lord (whether or not he really was). Their common design embraced the killing of Billy Green on the sidewalk in front of the game room by any member of the group. But not by a non-member." *Fagan*, 942 F.2d at 1160.

The evidence conclusively established that defendant and Dede were not the shooters. There was absolutely no evidence that any other BGD that was there was armed or close enough to the victim to have fired the fatal shot. In light of the total lack of supporting evidence, the seventh circuit found that the trial court had erred in assuming that the fatal bullet must have come from a gun fired by one of the BGDs.

The present case is distinguishable from *Fagan*. Here there is sufficient evidence to support the inference that the fatal shot was fired by a Black Disciple, specifically either Harmon, Newton, Wiseman, or Rickey. The evidence in this case established that, in the summer of 1995, defendant was a high-ranking leader of the Black Disciples. Harmon, Newton, Wiseman, and Rickey were all below defendant in the gang hierarchy.

On June 18, 1995, two Black Disciples, Frazier and Johnson, had a run-in with a group of KGBs in Marquette Park. Frazier was pistol whipped and both men were shot at by the rival gang. On the evening of June 19, 1995, Frazier and Johnson were on defendant's front porch with defendant and several other Black Disciples. Frazier heard defendant and Wiseman discussing a hit in the park that night. Frazier was paged by his father and went home. He returned to defendant's house about 45 minutes later.

Harmon and Newton arrived at defendant's house in their cars. Johnson heard defendant tell Harmon and Wiseman to park on 70th and California and to walk through the park and the KGBs should be right there. Defendant also told them to "spray" (shoot) the KGBs. Johnson saw defendant, Harmon, and Wiseman enter defendant's house. The three emerged moments later with Harmon carrying a 9 millimeter Uzi and defendant carrying a black gym bag. These items were placed in the trunk of Newton's car. The bullet eventually removed from the victim's body was a 9 millimeter.

Defendant drove Harmon, Wiseman and Rickey in Harmon's car to the edge of Marquette Park. Alston and Newton followed in New-

ton's car. Once at the edge of Marquette Park, Alston joined defendant in Harmon's car and they drove away, leaving the others at the park. As Alston and defendant pulled away, Alston saw Harmon, Wiseman, Newton, and Rickey looking in Newton's open trunk, where the 9 millimeter Uzi and black gym bag had been previously placed. As they left Marquette Park, defendant told Alston that there was going to be a retaliation in the park for what happened to Frazier and Johnson.

Moments later, Harmon, Wiseman, Newton, and Rickey returned to defendant's house. Johnson saw Harmon bring the black gym bag back into defendant's house. Defendant told Johnson that "they got the mother f--kers and tell Eddie it was taken care of." Wiseman showed Frazier a .38-caliber gun and said that they had taken care of business for him.

Following the shooting, the police were led to the 9 millimeter Uzi by Newton. The firearms expert testified that the 9 millimeter bullet recovered from the victim's body could have come from the 9 millimeter Uzi recovered by police. Both Johnson and Frazier identified the 9 millimeter Uzi recovered by police as the same Uzi they saw in defendant's bedroom on a prior occasion. Johnson further identified it as the 9 millimeter Uzi he saw Harmon carry out of defendant's house just moments before the shooting.

The reasonable inference to be drawn from this evidence is that Harmon, Newton, Wiseman, and Rickey were in Marquette Park, armed with the Uzi and a .38, and intending to kill any one they thought was a KGB.

The fact that defendant was not present at the time of the shooting is irrelevant as the evidence clearly established that defendant actively participated in the planning of the offense, provided his codefendants with the weapon that fired the fatal bullet, and drove his codefendants to the scene of the offense. See 720 ILCS 5/5—2(c) (West 1996); *People v. Nino*, 279 Ill. App. 3d 1027, 665 N.E.2d 847 (1996); *People v. Smith*, 278 Ill. App. 3d 343, 662 N.E.2d 480 (1996).

Defendant argues that the people on the bridge could have fired the fatal shot. However, Morales testified that the shots came from behind her and she was facing the bridge. Moreover, there is no evidence that the people on the bridge were armed. Defendant further argues that Matilda, the victim's friend, could have fired the fatal shot. There is simply no evidence that she was armed. Defendant suggests that the fatal shot could have been fired by a shooter from another gang. There was no evidence that any other armed gang was present in the area at the time of the shooting.

The evidence is sufficient to support the inference that either Harmon, Newton, Wiseman, or Rickey was the shooter.

Defendant further argues that he cannot be held accountable because the State did not prove which of the four actually fired the fatal bullet. According to defendant, where the prosecution fails to identify the principal shooter there is no intent to kill to be transferred nor common design to be agreed upon by the unknown shooter and the defendant. Defendant's reliance on *People v. Peterson*, 273 Ill. App. 3d 412, 652 N.E.2d 1252 (1995), and *People v. Lopez*, 72 Ill. App. 3d 713, 391 N.E.2d 105 (1979), is misplaced.

In *Peterson*, the two defendants argued and began shooting at one another, injuring an innocent bystander. The trial court found both defendants guilty of aggravated discharge of a firearm because they engaged in a course of criminal conduct, the foreseeable result of which was injuring an innocent bystander. On appeal, the court held that the defendants were acting at cross purposes, shooting at each other. The gunfight was spontaneous. There was no evidence that either defendant aided or abetted the other in furtherance of a common criminal design. Because the evidence did not establish that each defendant intended to promote or facilitate the other's conduct, the court held that the two defendants could not be held accountable for each other's conduct. The reasons they were not held accountable for each other's actions had nothing to do with the fact that the prosecution could not prove which defendant actually shot the bystander.

Similarly, in *Lopez*, the court found the evidence did not support a finding of accountability. Again, as in *Peterson*, this finding had nothing to do with the fact that the prosecution could not establish which defendant actually shot the victim. Rather, it had to do with the fact that there was no evidence of a common criminal plan or design or that the defendant shared the criminal intent of the principals.

Despite defendant's contention to the contrary, neither the *Peterson* court nor the *Lopez* court held that a defendant may never be held accountable for the conduct of a group unless the shooter from that group is specifically identified. Nor did either court hold that the doctrine of transferred intent can never be applied in conjunction with the doctrine of accountability unless the shooter is specifically identified.

The prosecutor does not have to establish which member of a group fired the fatal bullet, as long as everyone in the group is accountable for each other's actions. See *People v. Cooks*, 253 Ill. App. 3d 184, 625 N.E.2d 365 (1993) (court found that the evidence sufficiently demonstrated a common design and a community of unlawful purpose between defendant and the second unknown shooter); *People v. Foster*, 198 Ill. App. 3d 986, 556 N.E.2d 1214 (1990); *People v. Burrage*, 269 Ill. App. 3d 67, 645 N.E.2d 455 (1994) (two defendants properly

convicted of attempted murder under theories of accountability and transferred intent even though there was no conclusive evidence as to which defendant fired the shot that actually hit the victim); *People v. Shelton*, 293 Ill. App. 3d 747, 688 N.E.2d 831 (1997) (in a case where unintended victims were shot, defendant could have been convicted of murder based on an accountability theory if the jury believed that he ordered his fellow gang members to fire into a crowd).

Next defendant argues he was not proved guilty beyond a reasonable doubt because the State failed to identify the gun used in the shooting. First it should be noted that the State is not required to locate a gun and prove that it was the gun actually used in the shooting. *People v. Nitz*, 242 Ill. App. 3d 209, 610 N.E.2d 1289 (1993); *People v. Carter*, 57 Ill. App. 3d 84, 372 N.E.2d 1093 (1978). Second, there was sufficient testimony to identify the gun used to shoot the victim. Dr. Cogan testified that the victim died of a gunshot wound to the back. Ernest Warner, the police firearms expert, testified that the bullet recovered from the victim was a 9 millimeter and could have come from the Uzi shown to him at trial. Both Johnson and Frazier identified the Uzi shown to them at trial as the same gun they saw on defendant's bed about a year before the shooting. Moreover, Johnson identified it as the same gun he saw Harmon carry out of defendant's house on the night of the shooting. The police were led to the gun by Newton, a codefendant in the case.

Finally, defendant attacks the credibility of Alston, Frazier, Johnson, and Assistant State's Attorney Thomas, arguing that their testimony cannot constitute proof beyond a reasonable doubt. This argument also fails. It is well settled that credibility determinations are exclusively within the province of the jury. *People v. Nitz*, 143 Ill. 2d 82, 572 N.E.2d 895 (1991). Here the jury heard the testimony of each of these witnesses, was made aware of the infirmities in each witness's testimony and chose to believe these witnesses. We cannot now substitute our judgment for that of the trier of fact.

After considering all of the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found beyond a reasonable doubt that the essential elements of the crime were met by the evidence. This does not mean that we are making a finding as to defendant's guilt or innocence that would be binding on retrial. Rather, our consideration of the sufficiency of the evidence admitted at trial will remove the risk of subjecting defendant to double jeopardy. See *People v. Beringer*, 156 Ill. App. 3d 309, 509 N.E.2d 578 (1987).

Accordingly, for the reasons set forth above, the judgment of the

circuit court of Cook County is reversed and this cause is remanded for a new trial.

Reversed and remanded.

HOFFMAN, P.J., and SOUTH, J., concur.