In the

# United States Court of Appeals
## for the Seventh Circuit

_____

Nos. 21-3114 & 21-3094

UNITED STATES OF AMERICA,

*Plaintiff-Appellee/*
*Cross-Appellant,*

*v.*

JACKIE EDWARDS,

*Defendant-Appellant/*
*Cross-Appellee.*

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 17 CR 757 — **Sharon Johnson Coleman**, *Judge.*

_____

ARGUED MAY 23, 2023 — DECIDED DECEMBER 17, 2025

_____

Before BRENNAN, *Chief Judge*, and SYKES and PRYOR, *Circuit Judges*.

SYKES, *Circuit Judge*. Jackie Edwards came to the attention of federal law enforcement when a Title III wiretap of an associate's phone produced evidence of drug-trafficking activity at his home outside Chicago. Agents with the Drug Enforcement Administration ("DEA") obtained authoriza-

tion to expand the wiretap to include Edwards's phone. In addition to information about drug transactions, his phone calls showed that he was worried about being set up for a robbery and that he kept a pistol.

Edwards was forbidden to possess firearms based on his criminal history, which includes two federal felony drug convictions and an Illinois conviction for voluntary manslaughter. When he left his home the day after the conversation about the pistol, the agents followed him.

Surveillance continued to a location on the south side of Chicago where Edwards made five consecutive right turns in rapid succession—a telltale countersurveillance technique. The agents initiated a stop to investigate, pulling in behind Edwards and approaching his vehicle with firearms drawn. One carried an AR-15; the other three drew their sidearms. They told Edwards to show his hands and exit the vehicle. He did not comply; instead he leaned on the horn and reached toward the center console. The officers removed him from the car, but he resisted a frisk. They took him to the ground, handcuffed him, and returned him to his feet. He continued to resist, rotating his body as if to hide something on his right side. An officer eventually stabilized Edwards and recovered a handgun from his right coat pocket.

Edwards was charged with possessing a firearm as a felon in violation of 18 U.S.C. § 922(g)(1). He moved to suppress the gun, arguing that the officers' show and use of force converted the encounter into an arrest without probable cause. The district judge disagreed and denied the motion. A jury found him guilty, and the judge denied his posttrial motions for acquittal or a new trial.

On appeal Edwards takes a kitchen-sink approach, challenging everything from the denial of his suppression motion to the sufficiency of the trial evidence to several of the judge's trial rulings that formed the basis of the failed posttrial motions. His arguments are uniformly meritless.

The government cross-appealed, arguing that the judge incorrectly concluded that Edwards's conviction for voluntary manslaughter is not a qualifying predicate for an enhanced sentence under the Armed Career Criminal Act ("ACCA"). The government's point is well taken. In *United States v. Teague*, 884 F.3d 726, 728–29 (7th Cir. 2018), we held that the current version of this Illinois crime—now called second-degree murder—qualifies as a "crime of violence" under the ACCA's parallel provision in the Sentencing Guidelines. Edwards was convicted under the predecessor statute, but there is no material difference in the language of the old and new versions. We therefore affirm Edwards's conviction but vacate his sentence and remand for resentencing.

## I. Background

Edwards surfaced on the DEA's radar based on information obtained from intercepted phone calls in a Title III wiretap investigation of a St. Louis heroin dealer. After checking Edwards's criminal history, which includes two federal felony drug-dealing offenses and a 1982 Illinois conviction for voluntary manslaughter, agents obtained authorization to tap his phone.

Task Force Officer Patrick Budds and other DEA agents monitored Edwards's calls for 12 days, intercepting conversations in which he used coded language to discuss

purchases of marijuana in distribution quantities. The details are largely unimportant—this is a firearm-possession case, not a drug-trafficking case. As relevant here, Officer Budds learned the following from the intercepted phone calls: (1) a man named Thayer Daineh was supplying Edwards with quantities of marijuana at Edwards's home in Richton Park just outside Chicago; (2) Edwards worried that he was being targeted for a robbery; and (3) he sought help from his Chicago-based associates in identifying the robber.

Things came to a head when Edwards was overheard planning a trip into the city and discussed the need to "get" the would-be robber. It was in this context that he mentioned his gun, saying: "Nothin' I needed I wasn't takin' to no police station with me shit, my pistol there[,] my mother-fuckin' everything there." In another phone call that same day, Edwards and Daineh made plans for the latter to come to Edwards's home the next morning to pick up payment for an earlier drug sale.

Budds relayed this information to Chicago-based DEA Agent Jola Lech and Task Force Officer Doug Savarino. He directed Savarino to establish surveillance of Edwards's home to watch for Daineh's arrival. The next morning Savarino cautioned the surveillance team, which included Agent Lech and Officer Keith Billiot, that Edwards was heard "bragging about having a firearm" and that he "has a conviction for homicide" in addition to his narcotics-related convictions. After establishing a surveillance perimeter outside Edwards's house, Officer Savarino again warned the other officers that Edwards kept a gun.

Daineh arrived at Edwards's home as expected. The agents watched him enter the house with a brown bag and

emerge a few minutes later with the brown bag and a white plastic bag. Some members of the surveillance team then followed Daineh. They were joined by officers from the Illinois State Police, who stopped Daineh on the interstate and seized about $30,000 in cash from his car.

Based on the evidence seized from Daineh and gathered from the wiretap and in-person surveillance, Officer Budds directed Savarino to apply for a search warrant for Edwards's house. Meanwhile, Budds—still monitoring the wiretap—overheard Edwards indicate that he was leaving his house for Chicago. Officer Budds conveyed this information to Agent Lech, who in turn notified Officer Billiot. Based on Officer Savarino's prior communications, Billiot expected that Edwards would likely be armed and shared this concern with the team.

When Edwards left his house, four officers—Billiot, Agent Ramon Santiago, and Task Force Officers Cortland Campbell and Joe Ryczek—followed him in two unmarked vehicles. Edwards was driving a white SUV with tinted windows. The officers followed him for about half an hour as he drove 26 miles from his home in Richton Park to the intersection of West 69th Street and South Racine Avenue on the south side of Chicago. Edwards then made five consecutive right turns around the block, a countersurveillance maneuver known to law enforcement as "squaring the block."

After the last of the right turns, Edwards pulled over to the curb near the corner of 69th Street and Racine Avenue, where he had a laundromat business. Officer Billiot pulled in behind him and activated his emergency lights to initiate an investigative stop. The stop was captured on video, which

was admitted and played at trial. The following account is drawn from the video evidence and the officers' testimony at the suppression hearing and trial.

Wearing a DEA vest and carrying an AR-15 rifle, Officer Billiot approached the driver's side of Edwards's SUV. He identified himself and ordered Edwards to put his hands out of the window, which at that point was about halfway open. Edwards initially complied but then reached toward the center console of the vehicle. Officer Billiot told Edwards to get out of the car; he did not comply. Instead he leaned on the car horn. The other three officers approached the vehicle with their sidearms drawn but pointed at the ground.

Edwards then began to close his window. Officer Billiot responded by attempting to strike the window with the muzzle of his rifle. He missed; the muzzle went through the open window, nearly striking Edwards in the head. About ten seconds later Edwards unlocked his door, and the officers pulled him out of the car.

The officers attempted to frisk Edwards for weapons, but he resisted, shifting positions to evade the search. Specifically, he spun his body away from the officers in an apparent attempt to hide his right-side coat pocket. When he continued to resist the frisk, the officers took him to the ground, placed him in handcuffs, and returned him to a standing position. He continued to resist the search, rotating his body so that his right side was up against the car, a technique that Officer Campbell described as "blading"—an apparent effort to avoid the discovery of something hidden on that side. As Edwards continued to move about, Officer Campbell felt a hard object on Edwards's right side. After stabilizing the situation, Campbell recovered a handgun from Edwards's

right coat pocket. The entire encounter—from the moment Edwards pulled to the curb to the recovery of the gun—took less than six minutes.

A grand jury indicted Edwards for unlawfully possessing a firearm as a felon in violation of § 922(g)(1). Edwards moved to suppress the gun. He argued that the agents lacked reasonable suspicion to stop and frisk him and that their show and use of force at the scene converted the encounter into an arrest without probable cause. The district judge initially denied the motion on the papers but later granted Edwards's request for reconsideration and scheduled a hearing to take evidence.

After a lengthy evidentiary hearing, the judge again denied the motion. She held that the encounter remained an investigative stop, not an arrest, and that the officers reasonably suspected that Edwards was unlawfully carrying a firearm. Among other things, the judge pointed to the following evidence as justification for the investigative stop and frisk: (1) the intercepted phone calls indicating that Edwards was engaged in drug trafficking; (2) Daineh's collection of payment at Edwards's home that morning and the recovery of a large amount of cash from him when he was stopped soon after leaving the home; (3) the intercepted phone calls from the previous day indicating that Edwards was worried about a robbery, planned to travel to Chicago, and intended to carry his pistol; and (4) Edwards's felony record, including his convictions for narcotics trafficking. The judge also explained that the officers' show and use of force did not convert the stop into an arrest but instead was a reasonable response based on the information known to them and Edwards's behavior at the scene.

Though the case against Edwards was quite straightforward, the trial was characterized by evidentiary skirmishes stemming from his effort to mount a defense that the officers had planted the gun on him, and relatedly, his attempt to paint the officers' use of force as excessive. The "plant" defense was at best implausible; the excessive-force argument was simply irrelevant. As is often the case, the judge was called on to manage the trial in a fluctuating environment as the defense evolved and the government responded to shifts in defense strategy and emphasis. Based on the patchwork of arguments Edwards raises on appeal, some detail about the trial is necessary.

As relevant here, the evidentiary disputes centered on the extent to which the government could elicit testimony from its witnesses regarding the background wiretap investigation. Before the trial started, the parties agreed in principle that the government would not introduce evidence relating to the drug/Title III investigation. But the prosecution expected the defense to argue that the officers had no reason to stop Edwards and that he was randomly—and improperly—targeted for a stop. Accordingly, the government sought to preserve its option to elicit limited testimony about the investigation as background for the stop and recovery of the gun. Edwards objected. The judge sided with the defense, excluding any testimony about the investigation.

The first challenge to the scope of that ruling came late on the first day of trial. During the government's opening statement, the prosecutor began his description of the case in a routine way, telling the jurors that they would hear testimony that "four agents and officers of the Drug Enforcement

Administration" were on duty and following Edwards's SUV at 69th Street and Racine Avenue on the date in question. The defense objected to the reference to the DEA. The judge overruled the objection but at sidebar told the prosecutor to avoid the terms "Drug Enforcement Administration" and "DEA" until further notice. The defense attorney's opening statement emphasized the officers' use of force during the stop and signaled the defense theory that they planted the gun on Edwards.

The next day, before the jury returned to the courtroom, defense counsel moved for a mistrial and dismissal of the indictment with prejudice, accusing the prosecutor of misconduct for referring to the DEA in his opening statement. The judge denied the motion but instructed the government to use the term "federal agents" instead of "DEA agents," unless the defense opened the door to specifically identifying the law-enforcement agency involved in the case.

The prosecutor then raised a counterpoint about the defense attorney's opening statement, arguing that her emphasis on the officers' use of force was irrelevant and would leave a misleading impression about the agents' conduct unless the jurors could hear limited testimony about the investigation as background—particularly the lawfully intercepted phone call in which Edwards discussed carrying his pistol. The judge responded that both sides' opening statements were "problematic" and said she was considering striking them. Neither attorney objected. When the jurors returned to the courtroom, the judge reminded them that "opening statements are not evidence." She then went a step further, saying: "[I]n fact, don't give them any consideration at all. We're going to just start with the evidence today. Do

not focus on what you heard yesterday." Again, neither side objected.

The issue arose again during the defense attorney's cross-examination of Officer Campbell, who had found the gun in Edwards's pocket. After a lengthy cross-examination attempting to lay a foundation for an argument that the officers had no reason to believe that Edwards was carrying a gun—setting up the defense theory that they planted the gun in his pocket—the prosecutor objected. He argued that the defense was using the shield of the judge's pretrial ruling as a sword, creating the misleading impression that the officers had randomly targeted Edwards, lacked any basis to suspect him of carrying a gun, and used excessive force. The prosecutor asked the judge to reconsider her pretrial ruling, arguing that counsel's cross-examination of Officer Campbell had opened the door to the admission of at least some evidence about the background investigation.

The judge agreed with the prosecutor, but the extent of the latitude she granted the government remained unclear as testimony resumed. After some additional twists and turns in the evidence, she paused to review the transcript of the phone call in which Edwards had discussed his pistol. She eventually settled on a very narrow modification of her pretrial order that heavily favored the defense. She maintained her previous order excluding evidence regarding the investigation, including the "pistol" phone call. But she permitted the government to call Agent Lech to testify that (1) she was the supervising case agent and in that capacity was the clearinghouse for information in the case; and (2) prior to the stop, she advised the surveillance team that Edwards might have a gun.

In closing argument Edwards's counsel stuck to the original defense theory, arguing that he "never possessed" the gun and that the officers must have planted it on him. The jury rejected this theory and found him guilty. After an extended interruption because of the pandemic, the case proceeded to posttrial motions. Edwards moved for judgment of acquittal and, alternatively, a new trial under Rules 29 and 33 of the Federal Rules of Criminal Procedure. The latter motion focused on the evidentiary disputes we've just described and raised what the judge characterized as a "litany of purported judicial errors." The judge denied both motions.

At sentencing the parties disagreed over whether Edwards was subject to enhanced penalties under the ACCA, which imposes a 15-year minimum sentence for a § 922(g)(1) violation if the offender has three prior convictions for a "violent felony" or a "serious drug offense." 18 U.S.C. § 924(e)(1). As we've noted, Edwards's criminal history includes two federal drug-trafficking convictions and a 1982 Illinois conviction for voluntary manslaughter. The federal drug convictions unquestionably qualify as serious drug offenses, as the probation officer concluded in the presentence report (and everyone agreed). But the probation officer concluded that the Illinois voluntary-manslaughter conviction is not properly classified as a "violent felony" under § 924(e)(2)(B) and thus recommended against an ACCA-enhanced sentence.

The government challenged the latter conclusion, arguing that the Illinois crime of voluntary manslaughter is a qualifying ACCA predicate. For support the government relied on our decision in *Teague*, which held that the current

version of the offense—now called second-degree murder—is a qualifying "crime of violence" under the provision in the Sentencing Guidelines that mirrors the ACCA. 884 F.3d at 729. The judge rejected this argument, accepted the probation officer's recommendation, and imposed an unenhanced sentence of 60 months in prison.

## II. Discussion

### A. Suppression Motion

Edwards first challenges the judge's denial of his suppression motion, arguing that the agents' conduct during the investigative stop converted the encounter into a de facto arrest unsupported by probable cause. Alternatively, he argues that even if the encounter remained an investigative detention, the agents lacked reasonable suspicion to stop and frisk him.

The second argument is borderline frivolous. The Fourth Amendment secures the right to be free from unreasonable searches and seizures. U.S. CONST. amend. IV. The Amendment generally requires probable cause to support a seizure, but the *Terry* investigative stop is a prominent exception to the probable-cause rule. *United States v. Eymann*, 962 F.3d 273, 282 (7th Cir. 2020) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). The Supreme Court's decision in *Terry* authorizes police officers to briefly detain a person for investigative purposes "based on the less exacting standard of reasonable suspicion that criminal activity is afoot." *Id.* (citing *Terry*, 392 U.S. at 21–22).

"Reasonable suspicion" is not a high bar. To comply with the Fourth Amendment's reasonableness requirement as construed in *Terry*, officers must have "specific and

articulable facts" that when "taken together with rational inferences from those facts" warrant a brief intrusion on personal liberty for investigation purposes. *Terry*, 392 U.S. at 21. The standard is objective: it considers the totality of the circumstances and "requires more than a hunch but less than probable cause and considerably less than preponderance of the evidence." *United States v. Reedy*, 989 F.3d 548, 552 (7th Cir. 2021) (quoting *Gentry v. Sevier*, 597 F.3d 838, 845 (7th Cir. 2010) (internal quotation marks omitted)). At bottom, reasonable-suspicion determinations are "based on commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).

The information known to the agents easily satisfies this standard. We note first that under the collective-knowledge doctrine, the officers who followed and detained Edwards could conduct the stop even though they did not have firsthand knowledge of *all* the facts contributing to reasonable suspicion. *Eymann*, 962 F.3d at 284. When law-enforcement officers or agencies "are cooperating in an investigation, … the knowledge of one is presumed shared by all." *Id.* (quoting *Illinois v. Andreas*, 463 U.S. 765, 771 n.5 (1983)). So the agents who conducted the stop could rely on information provided by other officers involved in the investigation. *United States v. Kahn*, 937 F.3d 1042, 1052–53 (7th Cir. 2019).

That information was plentiful and came largely from Edwards's intercepted phone calls, which established that he (1) was engaged in drug trafficking; (2) expressed concern about being targeted for a robbery; (3) solicited help from Chicago-based associates in identifying the would-be robber; and (4) wanted to "get" the robber. Against this backdrop,

Edwards's calls also established that he planned to travel to Chicago and likely would be carrying his pistol when he did so. The agents also knew that Edwards was a twice-convicted drug trafficker with a manslaughter conviction and that one of his suppliers had collected a $30,000 drug payment from him that morning. Finally, the agents personally observed Edwards carry out a maneuver known to them as "squaring the block," a countersurveillance measure. This information, together with rational inferences drawn from it, gave them ample reasonable suspicion to conduct a *Terry* stop.

That brings us to Edwards's claim that the officers' conduct during the stop—primarily their display and use of force—converted the encounter into a de facto arrest. It did not. Edwards's argument to the contrary is meritless.

The line between a de facto arrest and a *Terry* stop can be subtle. Whether it has been crossed depends on the context and the circumstances confronting the officers. To generalize: "A *Terry* stop based on reasonable suspicion can ripen into a de facto arrest that must be based on probable cause if it continues too long or becomes unreasonably intrusive." *United States v. Bullock*, 632 F.3d 1004, 1015 (7th Cir. 2011). However, because "*Terry* stops often place law enforcement at great risk of physical danger," it is well established that an officer's display or use of force will not automatically transform an investigative stop into an arrest. *United States v. Olson*, 41 F. 4th 792, 799 (7th Cir. 2022).

Once again, the inquiry considers the totality of circumstances and the justification for the officers' conduct. "[W]hen officer safety is in question or a weapon may be present," officers may draw their weapons and use a degree

of force—including handcuffing the suspect—without converting a *Terry* stop into a de facto arrest. *Id.*

Finally, "there is no litmus-paper test for determining when a seizure exceeds the bounds of an investigative stop and becomes an arrest." *Bullock*, 632 F.3d at 1016 (quotation marks omitted). The inquiry turns on "whether the surrounding circumstances would support an officer's legitimate fear for personal safety." *Olson*, 41 F.4th at 799 (quotation marks omitted).

Applying these general principles here, the agents had good reason to suspect that Edwards might be armed and dangerous, and their use of force was a reasonable response to the circumstances they faced. We do not need to repeat the information known to them and the steps they took to respond to Edwards's resistance. It's enough to note that they were confronting a twice-convicted drug trafficker who—by his own words captured on the wiretap—was likely carrying a handgun and who, once stopped, resisted commands to show his hands and get out of his car and physically thwarted their efforts to frisk him for weapons.

We have long recognized that drug crimes often involve guns. *United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005) (explaining that there is "inherent danger" in stopping people "suspected of drug trafficking, for which guns are known tools of the trade"); *see also Bullock*, 632 F.3d at 1016 (holding that it was reasonable for officers to handcuff the suspect "[g]iven that officers were conducting a search for drugs" and "[d]rug crimes are associated with dangerous and violent behavior and warrant a higher degree of precaution"). Here the agents had much more than just an inference about the connection between drug crimes and

guns. Edwards was heard on the wiretap talking about locating the would-be robber and carrying his pistol with him when he went into the city. Based on this background and Edwards's resistance at the scene, the agents' use of force was reasonably calibrated to the escalating risk they faced and did not convert the stop into an arrest.

Finally, the duration of the stop did not cross the line into an arrest. There is no "bright-line time limit" on *Terry* stops: officers may reasonably "graduate their responses to the demands of any particular situation." *Reedy*, 989 F.3d at 553 (quotation marks omitted). Relevant considerations include the law-enforcement purposes for the stop, the time reasonably needed to accomplish those purposes, and the officers' diligence in pursuing the investigation. *Bullock*, 632 F.3d at 1015.

Here just six minutes elapsed between the agents pulling in behind Edwards's SUV and Officer Campbell recovering the gun from his pocket. By any measure, that is well within the scope of a reasonable *Terry* stop, whatever its purpose. Even if a six-minute *Terry* stop could be characterized as excessive (it cannot be), Edwards has only himself to blame for any extra time it took the officers to gain control of the situation. It was his own conduct, not the agents' actions, that increased the time needed to secure the scene for a *Terry* investigation. In short, the stop was not transformed into a de facto arrest. The judge properly denied the suppression motion.

## B. Rule 29 Motion; Sufficiency of the Evidence

Edwards next challenges the denial of his Rule 29 motion for judgment of acquittal. He insists that the evidence was

insufficient to convict him. This claim faces "a nearly insur-mountable hurdle": we "defer heavily to the jury's findings," view the evidence "in the light most favorable to the gov-ernment," and "will reverse only where no rational trier of fact could have found the defendant guilty." *United States v. Armbruster*, 48 F.4th 527, 531 (7th Cir. 2022) (quotation marks omitted). When reviewing a challenge to the sufficiency of the evidence, we will neither reweigh the evidence nor second-guess the jury's credibility determinations. *United States v. LeBeau*, 949 F.3d 334, 346 (7th Cir. 2020).

Edwards argues, in essence, that no evidence supports the jury's verdict that he possessed the gun recovered from his pocket—or put slightly differently, that it was irrational for the jury to reject his theory that the officers planted the gun on him. This argument is frivolous. The jurors watched the video of the encounter and heard testimony from several agents and officers who participated in the stop and frisk, all of which gave them an ample basis to reject the "plant" defense, credit the government's case, and return a guilty verdict. The verdict has abundant evidentiary support.

### C. Rule 33 Motion for a New Trial

Edwards also argues that the judge wrongly denied his Rule 33 motion for a new trial. As relevant here, the motion challenged the judge's decision to strike the defense attor-ney's opening statement and several of her rulings concern-ing the government's requests to elicit limited testimony about the underlying drug investigation.

Rule 33 permits the district court to vacate a judgment and grant a new trial in a criminal case "if the interest of justice so requires." We review Rule 33 rulings for abuse of

discretion. *United States v. Hamdan*, 910 F.3d 351, 357 (7th Cir. 2018). In this context, appellate review is "highly deferential, recognizing that the exercise of power conferred by Rule 33 is reserved for only the most extreme cases." *Id.* (quoting *United States v. Conley*, 875 F.3d 391, 399 (7th Cir. 2017) (internal quotation marks omitted)). Courts have ordered new trials under Rule 33 "in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *Id.* (quotation marks omitted).

As explained in our account of the trial, the rulings Edwards challenges were actually quite favorable to the defense. Before trial, the judge broadly excluded evidence of the underlying drug/Title III investigation. Then, responding to the skirmish over the opening statements—including the prosecutor's reference to the DEA—the judge struck *both* opening statements and directed the prosecutor to use the term "federal agents" and not refer to the DEA. Later, the judge concluded that the defense had opened the door to at least *some* background testimony about the underlying investigation. Even so, she stuck to her original ruling excluding evidence of the underlying drug investigation and permitted only tightly circumscribed testimony from Agent Lech—namely, that she was the case supervisor and had advised the surveillance officers that Edwards might have a gun.

These rulings were, if anything, noticeably protective of the defense. The judge was on solid ground in denying the Rule 33 motion for a new trial.

**D. Sentencing**

The government's cross-appeal concerns the judge's decision not to sentence Edwards pursuant to the Armed Career Criminal Act's system of enhanced penalties. Under the ACCA, offenders with three prior convictions for a "violent felony" or a "serious drug offense" are subject to enhanced penalties for § 922(g)(1) violations. § 924(e). Edwards has two federal drug-trafficking convictions, which everyone agrees are ACCA predicates. The government argued at sentencing that his 1982 Illinois conviction for voluntary manslaughter is a "violent felony," qualifying as the third predicate for an ACCA-enhanced sentence. With support from the probation officer, Edwards disagreed. The judge sided with him and declined to impose an enhanced sentence under the ACCA. The government challenges that conclusion.

We review de novo whether an offense qualifies as a crime of violence under the ACCA. *United States v. Hampton*, 585 F.3d 1033, 1042 (7th Cir. 2009). As relevant here, the ACCA defines the term "violent felony" as "any crime punishable by imprisonment for a term exceeding one year … that has as an element the use, attempted use, or threatened use of physical force against the person of another." § 924(e)(2)(B)(i).

Classifying crimes under the ACCA's so-called "elements clause" requires a categorical approach, which means that we look only to the statutory text of the crime of conviction to determine whether its elements meet the federal standard. *Borden v. United States*, 593 U.S. 420, 424 (2021). In *Borden* the Supreme Court held that the elements clause in the ACCA's violent-felony definition does *not* include offenses criminal-

izing reckless conduct (or by necessary implication, negligence). *Id.* at 429.

The statute under which Edwards was convicted in 1982 provided as follows:

> A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by: (1) The individual killed, or (2) Another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

38 ILL. COMP. STAT. 9–2 (1961). The statute has since been renumbered, and the crime previously known as "voluntary manslaughter" is now called "second-degree murder," but the definitional language remains unchanged.

In *Teague* we addressed the current version of the statute to determine whether it qualifies as a "crime of violence" under the ACCA's parallel provision in the Sentencing Guidelines, which contains the same "elements clause" as the violent-felony definition in the ACCA. 884 F.3d at 728–29. The district court in *Teague* had "focused on the language 'negligently or accidentally causes the death of the individual killed,'" which led the court "to conclude that the offense did not include as an element the intentional or knowing use of force." *Id.* at 729.

We reversed, noting that the statute codifies the principle of transferred intent. Citing the Illinois Appellate Court's decision in *People v. Thompson*, 730 N.E.2d 118, 123 (Ill. App.

Ct. 2000), we explained that the statutory language "only refers to situations in which a person has the intent to kill one person but his actions result in the death of another." *Teague*, 884 F.3d at 729.

In other words, the statute applies when a person intends to kill one person "but kills an unintended victim." *Id.* (quoting *Thompson*, 730 N.E.2d at 123). The offense thus remains an intentional crime even though the actual victim was an unintended target. *Id*. We held that "[b]ecause an offender cannot be convicted of second degree murder without the government proving beyond a reasonable doubt that the offender acted with the intent or knowledge that [his] actions would cause the death of another, the offense is a crime of violence under the elements clause" in the Guidelines. *Id.*

The same conclusion applies to the predecessor statute under which Edwards was convicted, which as we've noted contains the same language in all material respects. Contemporaneous Illinois caselaw confirms this conclusion. *See, e.g.*, *People v. Leonard*, 415 N.E.2d 358, 363 (Ill. 1980) ("The offense of voluntary manslaughter has commonly been described as '[a]n intentional homicide'" with mitigating factors.); *People v. Moore*, 513 N.E.2d 87, 90 (Ill. App. Ct. 1987) ("Voluntary manslaughter is not … an unintentional crime. … [It] is unlike involuntary manslaughter, for example, in that it does involve an actual intent to kill." (emphasis removed)).

Our conclusion should not come as a surprise.[1] In *Teague* we traced the history of this Illinois crime, explaining that "[i]n 1986 Illinois restructured its criminal code and the offense of 'voluntary manslaughter' was renamed 'second degree murder.'" 884 F.3d at 729. We noted that although the language was "modified somewhat[,] … the core offense remained the same—murder plus mitigation." *Id.* (quotation marks omitted). Accordingly, Edwards's 1982 conviction for voluntary manslaughter is an ACCA predicate. The judge wrongly concluded otherwise.

For these reasons, we AFFIRM the § 922(g)(1) conviction but VACATE the sentence and REMAND for resentencing.

---

[1] Indeed, the Supreme Court recently held that "second-degree murder in New York … is a crime of violence" under a similar provision of the ACCA. *Delligatti v. United States*, 604 U.S. 423, 433 (2025).